[No. 10,645.—Department Two.]

## THE PEOPLE v. GEORGE W. SMITH.

RECORDING VERDICT—MINUTES OF THE COURT—ROUGH MINUTES.—The verdict was transcribed by the clerk upon a sheet of paper which constituted a portion of the minutes of the trial; and was then read to the jury, who were asked if that was their verdict, and answered that it was; but the verdict was not transcribed into the bound minute and order book until after the jury had been discharged.

*Held:* The proceedings were in all respects strictly in conformity to the requirements of the statute.

IMMATERIAL ERROR—CRIMINAL PRACTICE.—Under Section 1258 of the Penal Code, it is the duty of the Court to disregard technical errors or defects, or exceptions, which do not affect the substantial rights of the parties.

MURDER—INSTRUCTIONS—JUSTIFIABLE HOMICIDE—IMMATERIAL ERROR.— Upon a trial for murder, the Court gave two instructions upon the subject of justifiable homicide, which it was claimed were in conflict; but there was no evidence before the jury upon which such a plea could be predicated.

*Held:* It may be that the two instructions were not altogether reconcilable; but even conceding this, the error is immaterial. The question of justifiable homicide was not in the case, and it was not the duty of the Court to instruct the jury on the subject.

ID.—ID.—EVIDENCE OF CHARACTER.—The Court instructed the jury as follows: "The good character of a person accused of a crime, when proven, is itself a fact in the case; it is a circumstance tending in a greater or less degree to establish his innocence; it must be considered in connection with all the other facts and circumstances of the case. But if, after full consideration of all the evidence adduced, the jury believe the defendant to be guilty of any degree of crime, they should so find, notwithstanding proof of good character. *Held:* The instruction was correct.

ID.—ID.—BURDEN OF PROOF—REASONABLE DOUBT—EVIDENCE.—The Court instructed the jury as follows: "Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable, and this he may show by a *preponderance* of evidence merely. By a preponderance of evidence is meant that degree of proof which induces the mind of a reasonable man to believe one side of an issue in preference to the other."

*Held:* The instruction was erroneous; but under all the circumstances of the case, as the same are developed by the evidence, no prejudice could have resulted to the defendant from the error in this charge. There was nothing in the evidence to raise a reasonable doubt as to the defendant's guilt, and nothing to which the erroneous instruction was applicable.

APPEAL from a judgment of conviction and from an order denying the defendant's motion in arrest of judgment, and from an order refusing a new trial, in the Superior Court of Nevada County. CALDWELL, J.

*A. B. Dibble, J. M. Walling,* and *C. Taylor,* for Appellant.

*A. L. Hart,* Attorney General, for Respondent.

MORRISON, C. J.:

The defendant was prosecuted in the Superior Court of Nevada County for the crime of murder, charged to have been perpetrated in the felonious killing, with malice aforethought, of one T. W. Sigourney, on the twenty-sixth day of July, 1880. The trial resulted in a verdict of murder in the second degree, and the defendant was adjudged to suffer imprisonment for the term of twenty years. After the rendition of the verdict, and before judgment, a motion was made to discharge the defendant on the ground of an irregularity in the trial, which, it was claimed, was fatal. The proceeding complained of was as follows:

"The jury were by the Court instructed as to the law and charged with the cause, thereupon said jury retired to deliberate upon their verdict; said jury retired at about the hour of eleven o'clock P. M., Saturday, November 20, 1880, and returned into Court about the hour of four o'clock A. M., Sunday, November 21, 1880, and upon being interrogated by the Judge thereof, replied through their foreman that they had agreed upon a verdict, whereupon the foreman handed to the Judge of said Court a slip of paper, on which was written the following: 'We, the jury in the case of the People against George W. Smith, find the defendant guilty of murder in the second degree. L. D. Rathbourne, foreman.' After examining the same, the Judge of said Court handed the said verdict to the Clerk of said Court, and directed the Clerk to record the verdict; upon receiving the said verdict from the Judge of said Court, the said Clerk transcribed the same at length upon a sheet of paper, which constituted a portion of the minutes of said trial, and after the verdict was so recorded, the Court directed the Clerk to read the verdict as recorded, and thereupon the verdict as so recorded was read to the jury by the Clerk; the jury were then asked if that was their verdict as recorded by the Clerk, to which they all assented. The jury were then polled and each answered that that was his verdict, and were then discharged. The verdict was not transcribed into the bound minute and order book until after the jury had been discharged, but was transcribed before the Court convened the following day."

A question somewhat analogous was before the Court in Bank in the case of *The People* v. *Gilbert*, 51 Cal. 96, and it was there held that the irregularity did not constitute ground for reversal. In that case the jury was discharged before the entry of the verdict in the minutes, but in this case the verdict was entered in the rough minutes kept by the Clerk, and the proceedings were in all respects strictly in conformity to the requirements of the statute. The verdict was immediately recorded by the Clerk in full upon the minutes, it was read to the jury, and inquiry was made of them whether it was their verdict, to which inquiry they all answered in the affirmative. It is true that the verdict was not transcribed into a bound book until after the jury was discharged, but

this was an immaterial circumstance in the case, and in no manner affects the regularity and validity of the proceedings.

Numerous errors are assigned, some of which will be hereafter noticed, but, after a careful examination and analysis of the evidence in the case, we have come to the conclusion that none of the errors were of a character to injure the defendant, or to justify a reversal of the judgment. Section 1258 of the Penal Code provides that " after hearing the appeal, the Court must give judgment without regard to technical errors or defects, or to exceptions, which do not affect the substantial rights of the parties;" and this provision of the Code has been relied upon by the Court in several cases to prevent the ends of justice from being defeated by mere technicalities in no manner affecting the substantial rights of defendants. In the case of *The People* v. *Fenwick*, 45 Cal. 288, the Court said: " The instruction in this case was erroneous; but we do not think the defendant can complain of the error, for it was productive of no injury to him." And in the more recent case of *The People* v. *Gilbert, supra*, as well as in the case of *The People* v. *Sprague*, 53 Cal. 494, the same doctrine was enunciated by the Court.

A point is made upon the instructions of the Court to the jury. It is claimed that there was a conflict between instruction 2, page 20 of the transcript, on the law of justifiable homicide, and an instruction on the same subject on page 41 of the transcript. It may be that the two instructions are not entirely reconcilable, but even conceding this to be the case, it by no means follows that the judgment should be reversed. *The question of justifiable homicide was not in the case*, for the simple reason that there was no evidence before the jury upon which such a plea could be predicated. All of the numerous witnesses who testified on behalf of the prosecution substantially concur in their statements, and the evidence of each of the witnesses shows a case of homicide totally devoid of every semblance of self-defense. In the first place, the defendant commenced the difficulty. His own evidence shows this fact. It appears that the defendant and the deceased had had numerous business transactions together, out of which trouble arose, and personal quarrels ensued. This was some time before the killing. On the day of the

killing, the defendant was served with a copy of the summons and complaint in an action which had just been commenced against him by Sigourney. After the receipt of these papers the defendant sought the deceased, and, finding him on one of the streets, the following colloquy occurred between them: "Smith (the defendant) said to Sigourney, 'Good morning.' He (Sigourney) said, 'When did you get back?' I replied, 'So, Sig, you are going to rob me,' when he replied, 'I do not call it robbery;' then I called him a thief and a robber—when he said he did not call it robbery, and laughed. I became very angry right then, very mad, when I called him a thief and a liar. He said I should not use such language towards him. We were standing face to face, he with his hand on his hip pocket. He threw his hand down on his hip, and I drew and shot."

This is the account given by the defendant of the transaction, and is in substance all that he seemed to know about it. But there were numerous witnesses to the entire transaction, from all of whose testimony it clearly appears that there was no appearance of danger, and not a single circumstance to justify the shooting. After the first shot was fired the deceased turned and fled from the defendant. A second shot was fired—the deceased was still fleeing and the defendant in hot pursuit; and at last, after an interval of several seconds, and a continuous flight and pursuit, the defendant placed the muzzle of his pistol, holding the same in both hands, within a few inches of the back of the deceased, and discharged the third shot. It was the wound produced by this third shot that caused the death of Sigourney. In view of these circumstances, what becomes of the plea of justifiable homicide? It further appears that Sigourney was not armed, and was not in the habit of carrying arms. Upon both of these points the evidence is perfectly clear.

But the plea of self-defense seems to have been an afterthought with the defendant. The witness Bacigalupe says: "I met him (defendant) a few seconds after the shooting.

"Q. How many seconds, do you think?

"A. I could not say the number; only a few seconds.

"Q. Did you, at that time, have any conversation with him?

"A. I did.

" Q. Where ?

" A. In front of the National Hotel.

" Q. Did he or not give any reasons at that time why he had killed Sigourny ?

" A. I asked him what the matter was. He said that he had tried to rob him—didn't mention the name.

" Q. You asked what the matter was, and he said he tried to rob him. Can you give the words that he used ?

" A. I asked him what was the matter.

" Q. You said that to George Smith ?

" A. He answered that the son of a —— is trying to rob me.

" Q. Is that all ?

" A. That is all."

To the same effect is the evidence of George W. Welsh. His account of a conversation that he had with the defendant immediately after the shooting was the following:

" Q. How soon after the killing, or the shooting, did you see the defendant ?

" A. Well, it was a very few minutes.

" Q. Did the defendant come to you ?

" A. I met him on the street.

" Q. How near to the National Hotel was you with him ?

" A. In front of the National Hotel.

" Q. On the sidewalk ?

" A. Yes, sir.

" Q. Did he say anything to you as to the reasons why he had killed Sigourney ?

" A. I was coming down the street in front of the hotel when I saw the crowd, and I met Smith coming out of the crowd. I put my hands on him, and asked him why he had done that. His reply was ' because he had robbed him.'

" Q. Because who ?

" A. Sigourney.

" Q. Did he or did he not say anything to you about Sigourney having tried to shoot him or draw a weapon on him, or anything of that kind?

" A. He did not. That was all that passed between us."

The testimony of the witness Tompkins, also on this point, is significant. He says: " The defendant told me that

Sigourney was trying to rob him, and he further said: ' I am right ; I knew what I was doing.'   Q. Did he or did he not say anything about having done this in self-defense ?   A. He did not."

If, as the defendant claimed on the trial, the act of shooting was done in self-defense, it would have been the natural impulse of the defendant, immediately after the homicide, to have justified the killing upon that ground.   But he did not pretend at the time the act was committed, or immediately thereafter, that he considered himself in danger from any threatened act or design on the part of the deceased.   We are, therefore, justified in the conclusion that the plea of self-defense was simply an after consideration.   It finds no support in the evidence, and it was not the duty of the Court to instruct the jury on the subject.

The evidence of the declarations made by the defendant was matter in rebuttal, and the objection to its introduction was properly overruled by the Court.

The charge of the Court on the question of character is objected to.   It was as follows: " The good character of a person accused of a crime when proven is itself a fact in the case.   It is a circumstance tending in a greater or less degree to establish his innocence.   It must be considered in connection with all the other facts and circumstances of the case. But if after a full consideration of all the evidence adduced, the jury believe the defendant to be guilty of any degree of crime, they should so find, notwithstanding proof of good character."

It is claimed, on behalf of the appellant, that the above charge is opposed to the rule, as laid down in *The People* v. *Ashe,* 44 Cal. 288, and *The People* v. *Fenwick,* 45 id. 287; but we do not think so.   It appears to us to be a correct charge, and we can discover no legal objection to it.

We are of the opinion, however, that the Court did commit an error in instructing the jury as follows:

" Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof, on the part of the prosecution, tends to show that the crime committed only amounts to

manslaughter, or that the defendant was justifiable, or excusable, and this he may show by a *preponderance* of evidence merely. By a preponderance of evidence is meant that degree of proof which induces the mind of a reasonable man to believe one side of an issue in preference to the other." (*Stokes v. The People,* 53 N. Y. 164; *People v. Marshall,* Nov. 29, 1881.)

What we have already said, however, is a sufficient answer to this objection, and we can not see how, under all the circumstances of the case, as the same are developed by the evidence, any prejudice could have resulted to the defendant from the error in this charge. There was nothing in the evidence to raise a reasonable doubt as to the defendant's guilt, and nothing to which the erroneous instruction was applicable.

There are other points upon which it is claimed the Court below erred, but the errors, if such they were, did not affect any substantial right of the defendant. The whole of the evidence shows that the defendant was justly convicted, and we find nothing in the record to justify us in reversing the judgment.

It is proper for us to remark, that we have disregarded the objections made by the learned Attorney General to a large portion of the transcript, and have considered the case with reference to all the papers on file.

Judgment and order affirmed.

SHARPSTEIN and THORNTON, JJ., concurred in the judgment.