## STATE, RESPONDENT, *v.* SLOAN, APPELLANT.

[No. 1,844.]

[Submitted February 20, 1899. Decided March 20, 1899.]

*Homicide—Manslaughter— Self-Defense— Jury—Peremptory Challenges— Evidence — Character— Threats— Witnesses — Objections—Instructions.*

1. The name of defendant's wife was indorsed on the information among the names of the witnesses for the State, over his objection that she was incompetent; but on the trial she was excluded from testifying, on a renewal of the objection. *Held,* that he was not prejudiced by being compelled to object to her competency before the jury.
2. Under Penal Code, Secs. 2044, 2045, 2057, defendant is entitled to ten peremptory challenges, and the State to five, which must be taken as provided by Code of Civil Procedure, Sec. 1059, declaring that, if no peremptory challenges are taken until the panel is full, they must be taken by the parties alternately, commencing with plaintiff. *Held,* that an accused was properly compelled to exhaust alternately two peremptory challenges to each one taken by the State, where none were taken until the panel was full.
3. Evidence of a message sent by defendant to deceased the day before the homicide, stating that he did not want any trouble, but that, if deceased wanted any, he could get it, was admissible, together with the attendant circumstances.

*Obiter.*—Any declaration which indicates, however vaguely and indefinitely, an intention on the part of the accused to inflict violence upon the deceased, is admissible as a threat.

| 22 | 293 |
| 23 | 156 |
| 23 | 325 |
| f23 | 362 |
| 23 | 374 |
| 23 | 525 |
| 22 | 293 |
| 29 | 518 |
| 22 | 293 |
| 34 | 27 |
| 34 | 29 |
| 34 | 437 |
| 22 | 293 |
| 41 | 599 |

4. The jury may consider the previous good character of one accused of murder, whether or not they are in doubt whether deceased was the aggressor.

5. An instruction leaving the jury to determine the degree of homicide according as malice, essential to murder in the first degree, and passion, essential to manslaughter, predominated, is error, since, in law, both these mental conditions could not co-exist.

6. An instruction that, if the killing was prompted by passion, it is manslaughter, is error, because it fails to distinguish between passion and heat of passion necessary to reduce homicide from murder to manslaughter.

7. Instructions that, before defendant could slay deceased, he must have been in imminent danger of death or great bodily harm, are erroneous, since they ignore the right of defendant, as a reasonable man, to act on appearances.

8. An instruction that the accused could not kill his assailant until it appeared to him that he was about to commit a felony on him is error, since it limits the right of self-defense to his ability to distinguish between felonies and misdemeanors, whereas he should be guided by reasonable apprehension of death or great bodily harm, regardless of the nature of the assault.

9. An instruction stated that "'heat of passion,' as used in defining 'manslaughter,' means a condition of quick anger or sudden injury engendered by some real or supposed injury suffered at the time, and amounting to a temporary dethronement of reason, which must be sufficient to arouse an irresistible and uncontrollable passion in a reasonable person." *Held*, that it was confusing and unintelligible.

*Appeal from District Court, Gallatin County; F. K. Armstrong, Judge.*

ROLAND T. SLOAN was convicted of murder in the second degree, and he appeals. Reversed.

Statement of the case by the Justice delivering the opinion.

The defendant was tried in the District Court of Gallatin County under an information charging him with the murder of one William B. Russell on July 19, 1898. The jury found the defendant guilty of murder in the second degree.

The facts as shown by the record are the following: The deceased was the father-in-law of defendant. Prior to the date of the homicide there had been differences between defendant and his wife. She had twice left him and gone to the home of her father. Some time after the first separation she had become reconciled to her husband, and returned. Two days before the homicide, in the afternoon of Sunday, the 17th, these differences were renewed. This seems to have been due in some way to the influence of Fred. Russell (also called Johnnie Russell), a cousin of the wife. The wife again returned to her father's home, accompanied by Fred. Russell,

who was that day at defendant's home. Defendant furnished his wife and her companion a team to drive to her father's home, but forbade them to take anything with them from his place. They took the team, and started away. They also took with them a bundle of the wife's clothes. Defendant tried to make them leave the bundle, but Russell told him he would send him to the hospital if he interfered. Defendant armed himself, pursued them, and compelled them to return to his place and leave the bundle there. They were then allowed to proceed, the defendant following them for some distance on their way. Defendant and the deceased lived near Flathead Pass, in Gallatin county, about 25 miles from Bozeman. On the next day, the 18th, defendant and a companion, Earle Denny, rode into Bozeman for the purpose of get ing some extras for a mowing machine, and a saddle for Denny. They reached there about 2 o'clock in the afternoon. The deceased, Fred. Russell, and defendant's wife had also driven into Bozeman, and defendant discovered their presence there during the afternoon. Fred. Russell and defendant met during the afternoon, and had a conversation about the domestic troubles of the latter, and Russell arranged with him to bring about a meeting between defendant and his wife. Russell left defendant professedly for this purpose. Defendant then went to a hardware store, and purchased the revolver with which the homicide was committed. He then repaired to the Northern Pacific Hotel, where his wife was stopping, to obtain the interview with her promised by Russell. He there found Russell, but Russell refused to go with him to see his wife, and thereupon the plan for the interview was abandoned. Defendant had no interview with his wife. Before purchasing the revolver, defendant had also met the deceased at the store of Brandly & Ellis. No words passed between them, beyond a casual greeting. Defendant claimed that he purchased the revolver to protect himself from injury at the hands of Fred. Russell, because he blamed him for the trouble between himself and his wife, and because he thought Russell intended, by proposing

an interview between himself and his wife, to devise a plan to do him some injury.

The next morning the defendant and Denny arose early to go home. They got their horses and started, but, before leaving town, stopped at two or three places to drink. They finally stopped at the Tivoli saloon and restaurant. As they went in, they found deceased standing at the bar, and greeted him. Denny asked him to drink. He refused. They all stood at the bar, Denny being between defendant and deceased. Denny and defendant were about to drink. Deceased stepped by them, to the right of defendant, and asked him: "Are you going to let that girl have her clothes?" To this, defendant replied that he would, when she came after them right; meaning, as he said, whenever she came without Fred. Russell in her company. There is some conflict among the witnesses as to what else was said. The substance of the rest of the conversation was a threat on the part of Russell to take them any way, and a statement by defendant that he would give them up when he got ready. Thereupon, with an oath, Russell struck defendant in the face with his fist, breaking the skin upon his nose, and causing the nose to bleed. The blow staggered defendant, and he fell back against the bar. Deceased then caught him around the neck with one arm, and with the disengaged hand continued striking defendant in the face.. The struggle continued for a few moments, the deceased maintaining his advantage. Thereupon defendant drew his revolver, which deceased caught. It was discharged, the ball entering the body of deceased near the groin. Deceased lived about three hours after the shooting. The defendant thereupon mounted his horse, and, in company with Denny, rode to Belgrade, in Gallatin county, where, after consulting with one Johnston, a constable residing there, he gave himself up, and was put under arrest.

Fred. Russell testified that when defendant left him, in company with defendant's wife, on the Sunday afternoon before the trouble, he said: " 'Well, so long. Tell the old man I don't want any trouble, but, if he wants any, he can

get it,' or something like this.''. Defendant did not know when he left home on the 18th that he would meet deceased or any of the Russell family in Bozeman, nor did he know of the presence of deceased in the Tivoli saloon at the time he went there. Defendant had previously borne a good reputation for peace and good order. There is some evidence in the record that the deceased had not borne the best reputation in this regard. The defendant is a small man. The deceased was heavier and larger in every way.

The court below announced judgment upon the verdict of the jury, fixing the punishment of the defendant at 15 years' confinement in the state prison. From this judgment, and an order overruling his motion for a new trial, defendant appeals.

*Hartman & Hartman*, for Appellant.

*C. B. Nolan*, *Atty. Gen.*, *H. C. Cockrill* and *W. L. Holloway*, for the State.

**BRANTLY, C. J.**—1. The defendant takes exception to the action of the District Court in allowing, on motion of the County Attorney, the name of Carrie Sloan, the wife of defendant, to be indorsed upon the information, among the names of the witnesses for the State. This was done in open court three days before the trial began. The defendant was present, and made objection that the witness was his wife, and could not be a witness against him. He now complains that he was compelled to object to her competency at the trial, in the presence of the jury, and was therefore prejudiced in their estimation. The Penal Code (Section 1734) requires the county attorney to indorse upon the information, at the time of filing it, the names of all witnesses for the State known to him. But nowhere do we find any provision requiring the names of subsequently discovered witnesses to be so indorsed. It is, however, a safe and proper practice to have this done, so that the defendant may have no ground to complain that he has not had sufficient opportunity to meet the testimony of

witnesses of whom he has received no notice.   But the failure
to have this done would not prevent the prosecution from ex-
amining at the trial a witness discovered after the filing of the
information.   The defendant could not complain, unless he
could show that he had not been allowed suitable opportunity
to meet such evidence.   It was not necessary that the name of
the wife should be indorsed, unless she was known to the
county attorney to be a witness at the time the information
was filed.   She could have been called at the trial and offered
by the State, subject to the objection defendant had a right to
make under Code of Civil Procedure, Sec. 3163.   The proper
time to make the objection was when the testimony was of-
fered.   We cannot distinguish the case under discussion from
any other case where incompetent evidence has been offered
and excluded.   The nature of the matters sought to be proved
by this witness is not revealed.   Presumably she would have
been an unfriendly witness.   When she was offered by the
State she was excluded, upon objection, when it appeared that
she was the wife of defendant.   We do not think defendant
was prejudiced.   *State* v. *McGilvery* (Wash.) 55 Pac. 117,
cited by counsel, is not in point. 

2.   During the selection of the jury, when the time came
to exercise the right of peremptory challenge, the court com-
pelled the defendant to exhaust two challenges to each one
taken by the State.   This is assigned as error.   Under the
Penal Code (Sections 2044, 2045) the defendant was entitled
to ten peremptory challenges, and the State to five.   "Chal-
lenges for cause and peremptory challenges must be taken in
the manner provided in Sections 1059, 1062, 1063 of the Code
of Civil Procedure."   (Penal Code, Sec. 2057.)   The Code
of Civil Procedure (Section 1059) provides:   "* * * Each
party is entitled to four peremptory challenges.   If no per-
emptory challenges are taken until the panel is full, they must
be taken by the parties alternately, commencing with the
plaintiff."   No challenge had been taken in this case until the
panel was full.   The other sections of the Code of Civil Pro-
cedure referred to in the section of the Penal Code cited *supra*

do not refer to the manner of taking peremptory challenges. The only reference to be found in any of these sections, or elsewhere in the Codes, to the manner or order in which they shall be taken, is Section 1059. This has reference to a condition where both parties have the same number of challenges. The contention is made by defendant that the proper construction of this section, as applied to criminal cases, is that the parties must alternately take one challenge each until the State has exhausted its number, and then defendant may continue challenging until he shall be satisfied, or has exhaused his entire number. We do not think the position tenable. The mandate of the statute is that the parties *alternate* in exercising this right. Alternation is possible only when the plan adopted by the District Court in this case is followed. The State gives the defendant the advantage of double the number of challenges it reserves for itself. It cannot for this reason be claimed that the defendant should have the additional advantage of reserving one-half his challenges until the State has exhausted its number. If this may be done, then there is no reason why the provision of the statute should not be construed to mean that the State should first take or waive all its challenges, and that the defendant, following it, should then take or waive all his. Thus the principle of alternation would be destroyed. No less would it be destroyed if the construction contended for by defendant's counsel should be adopted. Certainly, in giving defendant double the number of challenges reserved to the State, the design of the law is that he should have this advantage, but it is equally clear that he should enjoy this advantage in the way pointed out by the law. The rule enforced in the selection of the jury in this case has been observed uniformly in this State since its birth, and was the rule in use under the territorial government, under similar statutory provisions. We think it a fair and just interpretation of these provisions.

3. The defendant contends that the testimony of Fred. Russell, detailing the occurrences on Sunday afternoon before the killing, is immaterial, and should not have been admitted.

In this we think the defendant is wrong. Certainly the message sent by defendant,—"Well, so long. Tell the old man I don't want any trouble, but, if he wants any, he can get it," —tends to show the threatening attitude in which his mind stood towards the deceased. On the trial of an indictment for murder, previous threats of defendant against the deceased are competent as showing malice, or, when long before, as showing deliberation or premeditation. (Underh. Cr. Ev. Sec. 328.) This is the rule, even though the threat is conditional in its terms. (*State* v. *Johnson*, 76 Mo. 121; *State* v. *Adams*, 76 Mo. 355; *Schoolcraft* v. *People*, 117 Ill. 271, 7 N. E. 649.) The threat may not be to do any specific injury, if it tends to show a malicious condition of defendant's mind. (See case last cited.) "The language used need not be specific, as regards the means by which, or as to the time, place, or manner in which, violence is to be inflicted. It is for the court to say whether the utterance of the defendant imports a threat, and the cases go very far in admitting as a threat any declaration which indicates, however vaguely and indefinitely, an intention on the part of the accused to inflict violence upon the deceased." (Underh. Cr. Ev. Sec. 329.) Evidence of this language was properly admitted for the purpose indicated, and, for the purpose of giving the jury a clear understanding of its import, the attendant circumstances were properly admitted.

4. Evidence was offered by defendant tending to show that he had previously borne a good character for peace. The court below instructed the jury in this regard as follows:

"Evidence has been introduced as to the former good character of the defendant. This is to be taken into consideration by the jury, as one of the circumstances of the case, and as tending to illustrate or explain the circumstances attending the homicide, and tending to show who was the first aggressor, and who provoked this conflict; it being less probable and less reasonable that a man of former quiet and peaceable character would invite a contest, or make an unprovoked and violent attack upon another, than that a quarrelsome, violent and vic-

ious person would do so. And it 'is for this purpose this testimony is admitted, in case there is any doubt in your minds as to who was the aggressor at the time of the homicide.

"However, if the jury believe from the evidence, beyond a reasonable doubt, that the defendant committed the crime in question, as charged in the information, it will be your sworn duty as jurors to find the defendant guilty, even though the evidence may satisfy your minds that the defendant, previous to the commission of the alleged crime, had sustained a good reputation and character as a peaceable and law-abiding citizen."

This instruction practically tells the jury not to consider the evidence in this connection, unless they had doubts as to who was the aggressor. There is no controversy but that deceased was the aggressor. The jury therefore could not, under this instruction, consider at all the previous good character of defendant. It should have been submitted to the jury generally, leaving them to form their own conclusion, upon the whole of the evidence, whether an individual whose character was previously unblemished had or had not committed the crime for which he was called to answer. (Thomp. Trials, Sec. 2444; *State* v. *Northrup*, 48 Iowa, 583; *Booker* v. *State*, 76 Ala. 22; *People* v. *Doggett*, 62 Cal. 27; *People* v. *Bowman*, 81 Cal. 566, 22 Pac. 917; *People* v. *Smith*, 59 Cal. 601; *McQueen* v. *State*, 82 Ind. 74; *Rollins* v. *State*, 62 Ind. 46; *Hall* v. *State*, 40 Ala. 698; *State* v. *Clemons*, 51 Iowa, 274, 1 N. W. 546.) The rule adopted by the authorities cited *supra* is approved. The instruction, as given, is erroneous.

5. The court instructed the jury as follows as to malice and heat of passion:

"If you find from the evidence in this case that the defendant willfully and unlawfully killed the deceased, that such killing was done during a quarrel between deceased and defendant, and while defendant's passions were aroused, but you further find from the evidence that malice towards the deceased was present in defendant's mind immediately before and at the time of the killing, then you are instructed that the

mere fact that the killing was done during such quarrel, and while defendant's passions were aroused, is not sufficient to reduce the crime from murder to manslaughter; but you must determine from all the evidence whether or not such killing was prompted principally by such passion or by such malice. If by passion, it is manslaughter; if by malice, it is murder.''

Under our statute (Penal Code, Sec. 350) ''murder is the unlawful killing of a human being, with malice aforethought.'' ''Manslaughter is the unlawful killing of a human being without malice,'' either ''upon a sudden quarrel or heat of passion,'' or ''in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution or circumspection.'' (Penal Code, Sec. 355.) The distinction between murder and manslaughter, therefore, is that in the former the element of malice aforethought enters, while it is wanting in the latter. The malice necessary to the crime of murder cannot co-exist with the heat of passion. ''There can be no such thing in law as a killing with malice, and also upon the *furor brevis* of passion; and provocation furnishes no extenuation, unless it produces passion. Malice excludes passion. Passion presupposes the absence of malice. In law, they cannot co-exist.'' (*State* v. *Johnson*, 23 N. C. (1 Iredell's Law) 354, s. c. 35 Am. Dec. 742; 2 Bish. Cr. Law, Sec. 697.) The act of killing cannot be prompted by both. The heat of passion necessary to reduce the killing to manslaughter must be irresistible, as is sometimes said, and the killing must proceed from it. But the existence of such passion, aroused by adequate provocation, rebuts the idea that the act is the result of malice. This is true always where the heat of passion ensues from a sudden quarrel. The law in such case attributes the fatal blow to the impulse of passion. If, however, the killing appears to have been done with deliberate intention, and with a deadly weapon, under circumstances not requiring its use, then the inference is that malice, not passion, impelled the blow, and the homicide is murder. Again, if it appear that the intent to kill was previously

formed, then the existence of passion furnishes no extenuation. The homicide is murder. The distinction rests entirely upon the formation of the intent. If the intent is conceived in the heat of passion, the homicide is manslaughter. Otherwise it is murder. The instruction quoted is erroneous, in that the jury are left to determine the degree of homicide according as the one or the other of these mental conditions predominated. It fails, also, to draw any distinction between the mere existence of passion, and the existence of the heat of passion necessary to reduce the homicide from murder to manslaughter.

6. Exception is also taken to the following paragraphs of the charge:

"Although you should find from the evidence that the said William B. Russell and the defendant, Roland T. Sloan, got into a quarrel at the time in question, and that the said Russell struck the defendant with his fist, still the defendant would have no right to assault the said Russell with a deadly weapon, in a manner calculated to take life or do great bodily harm, unless there was reasonable ground to apprehend a design on the part of the said Russell to kill the said defendant or to do him some great bodily injury, and imminent danger of such design being accomplished, and the circumstances were such as to excite the fears of a reasonable person, and the defendant acted under the influence of such fears alone.

"The phrase 'great bodily injury,' as used in these instructions, means something more than mere apprehension, however imminent, of a mere battery not amounting to a felony. In order to justify the assault, and to slay an assailant, within the meaning of these instructions, there must be an apparent design on the part of such assailant to either take the life of the person assailed, or the infliction of some great bodily injury, amounting to a felony, if carried out; and, in addition thereto, there must be imminent danger of such design being accomplished."

Both these instructions were prejudicial to the defendant, in that the jury were told that, before defendant could slay de-

ceased, he must have been in imminent danger of death or receiving great bodily harm at the hands of deceased. They ignore the right of defendant, as a reasonable man, to act upon appearances as they were presented to him. This feature of the law of homicide is discussed by this Court in *State* v. *Rolla*, 21 Mont. 582, 55 Pac. 523, decided in December, 1898. It is not necessary to repeat here what is said in that case. The jury, in a preceding paragraph of the charge, had been fairly and correctly, though briefly, instructed on this subject. These instructions contradict and nullify the previous correct statement of the law, and were well calculated to confuse and mislead the jury. The first sentence of the latter of these instructions is open to the further criticism that it involves a confusion of terms. It was evidently the intention of the trial court to say that the apprehension or fear of great bodily harm means more than the mere apprehension or fear of a battery not amounting to a felony; in other words, the apprehension on the part of the defendant of a mere battery upon himself at the hands of deceased, not amounting to a felony, would not justify the killing of deceased. It is both inaccurate and misleading, in that it practically lays it down as the law that, though assaulted, the accused may not kill his assailant until it appears to him that the assailant is about to commit a felony upon him. The right of one assaulted to kill his assailant in self-defense should not be limited by his ability to distinguish between felonies and misdemeanors. He must be guided by a reasonable apprehension of death or great bodily harm, and the fear or apprehension of this latter from an unlawful beating at the hands of the assailant may be sufficient, even when the assault is lacking in some of the elements of felony.

7.   The first sentence of paragraph 16 of the charge is also open to the criticism that it is confused and unintelligible. It reads: " 'Heat of passion,' as used in defining 'manslaughter,' means a condition of quick anger or sudden injury engendered by some real or supposed injury suffered at the time, and amounting to a temporary dethronement of reason, which

must be sufficient to arouse an irresistible and uncontrollable passion in a reasonable person.''

Obviously the expressions ''quick anger'' and ''sudden injury'' are not synonymous. The phrase ''sudden injury'' expressed a physical not a mental condition. To a conscientious juror, endeavoring to gain from this instruction any distinct idea of the meaning of the expression ''heat of passion,'' it would be palpably misleading and confusing, as was doubtless the fact upon the trial of this cause.

In other respects the charge to the jury was fair and intelligible, covering all the points upon which instructions were required.

Counsel for defendant at the trial requested 31 instructions, all of which were refused. It is insisted that there are 21 of these that the court should have given. It is neither necessary nor proper to discuss them. Sufficient has already been said in regard to instructions to guide the court in a retrial of the cause.

It is contended by counsel that the facts in the case do not justify a verdict for murder in the second degree. As the cause must be tried again, and as, upon another trial, different conditions may be presented by the proof, we do not deem it proper to express an opinion on this point.

Let the judgment be reversed, and the cause remanded, with directions to grant defendant a new trial.

*Reversed and remanded.*

HUNT and PIGOTT, JJ., concur.