(November 24, 1902.)

## STATE v. WILMBUSSE.

[70 Pac. 849.]

INFORMATION—INDORSING NAME OF WITNESS.—Under section 2 of an act (5th Sess. Laws 1899, p. 125) requiring the district attorney to indorse on the information the names of all witnesses known to him, at the time of filing the same, and at such time before the trial of any case, as the court may rule or otherwise prescribe, indorse thereon the names of such witnesses as shall then be known to him it was not error to permit the prosecuting attorney to indorse the names of other witnesses on the information after the trial jury had been impaneled, it being shown that such witnesses were unknown to him prior to that time.

DYING DECLARATIONS—COMPETENCY TO MAKE IT.—When a paper purporting to be a dying declaration is offered in evidence, it is not error to deny the motion of counsel for defendant to then and there introduce evidence of the incompetency of the person to make such declaration, opportunity being thereafter given to introduce such evidence.

MENTAL CONDITION OF DECLARENT—EVIDENCE.—Before a dying declaration is admitted in evidence, the competency of the person to make it must be shown.

EVIDENCE THAT DEATH WAS IMMINENT.—In establishing the competency of a person to make a dying declaration, it is proper to show what he said in regard to his hope of recovery or his belief that death was at hand.

RES GESTAE.—The statement of person a few moments after he had received a fatal shot, that the defendant fired such shot, was a part of the *res gestae*, and was properly received in evidence.

WITNESS—COUNTY ATTORNEY.—A prosecuting attorney may be a competent witness for the state in a criminal action.

Argument for Appellant.

DYING DECLARATION.—A dying declaration, although not all written in the presence of the person making it, may be competent, where it is shown that the entire declaration was read to the deceased, and that he fully understood it and signed it as and for his dying declaration.

REJECTION OF OFFERED EVIDENCE.—It is not error to reject evidence showing that a deceased person was not competent to make a dying declaration two days after such declaration was made. The evidence must be confined to the competence of such person at the time the declaration was made.

(Syllabus by the court.)

APPEAL from District Court, Kootenai County.

The facts are fully stated in the opinion.

McFarland & McFarland, for Appellant.

It was error for the court to permit the county attorney to indorse the names of witnesses upon the information after the jury had been sworn to try the case. A number of said witnesses were sworn and testified against the defendant. The law provides that the names of witnesses be indorsed upon the information before trial. It cannot be done after the jury is sworn to try the case. (Laws 1899, p. 125, sec. 2.) This court has held that in civil actions attorneys should offer themselves as witnesses for their clients only in case of extreme necessity. (*Sebree v. Smith,* 2 Idaho, 359, 16 Pac. 915.) The court should not have admitted the alleged dying declaration, because it was shown that a great portion of it had been prepared by County Attorney Graham before it was mentioned to Judge Brady, or spoken of, or thought of by him, and without his having been previously consulted as to its contents, and because it was not first shown that the declarant believed he would not recover and that there was a prospect of "almost immediate dissolution" at the time of making and executing the declaration." (Greenleaf on Evidence, 14th ed., 158; *Vaughn v. Commonwealth* (Ky.), 19 S. W. 928; *People v. Sanchez,* 24 Cal. 17; *United States v. Woods,* 4 Cranch C. C. 484, Fed. Cas. No. 16,760; *United States v. Veitch,* 1 Cranch C. C. 116, Fed. Cas. No. 16,614.) Sheriff Dyer was put upon the

stand to prove that on the sixteenth day of July, and just twenty-four hours after the dying declaration had been made and signed, that Judge Brady was in such condition and frame of mind as to render him incompetent to make a dying declaration, or to know or understand what he was going or saying. The defendant was entitled to the evidence and it was reversible error to reject it and overrule the questions. (*McBride v. People*, 5 Colo. App. 91, 37 Pac. 953; *Mitchell v. State*, 71 Ga. 128; *Hays v. Commonwealth*, 12 Ky. Law Rep. 611, 14 S. W. 833; *People v. Beverly*, 108 Mich. 509, 66 N. W. 379.)

Frank Martin, Attorney General, for the State.

The first error urged by appellant is that the court permitted the prosecuting attorney to indorse the names of witnesses upon the information after the jury had been sworn to try the case. The record shows that after the jury had been impaneled before any witnesses were sworn, the prosecuting attorney moved the court for permission to indorse upon the information the names of three witnesses; that he presented to the court his affidavit showing that he did not know of the said witnesses at the time of filing the information; that he had found out since filing it that they were material and necessary witnesses upon the part of the state, and upon that showing the court permitted the names of the witnesses to be indorsed upon the information. This question is discussed at length in several opinions of the supreme court of Montana, under a similar statute to ours, in which the court decided that a ruling of the lower court similar to the one here complained of was not error. Many decisions from the courts of other states are cited in these opinions from Montana. (*State v. Schnepel*, 23 Mont. 523, 59 Pac. 927; *State v. Calder*, 23 Mont. 504, 59 Pac. 903; *State v. Sloan*, 22 Mont. 293, 56 Pac. 364.) The next objection of appellant is that the court erred in permitting the prosecuting attorney, James Graham, to testify in regard to the dying declaration. Just wherein there was any error counsel does not point out and we are unable to discern. It seems to be a matter of necessity for the county attorney to testify as to how this declaration was

taken, and upon what theory the admission of the evidence could be error we are at a loss to know. (*State v. Seymour*, 7 Idaho, 548, 63 Pac. 1036.)   Where insanity is set up as a defense it devolves upon the defendant to show by a preponderance of evidence that at the time he committed the offense his mind was in that condition that he could not know that he was doing wrong. (*State v. Hurst*, 4 Idaho, 345, 39 Pac. 554; *Kelch v. State*, 55 Ohio St. 146, 60 Am. St. Rep. 680, 45 N. E. 6, 39 L. R. A. 737; also extensive note to this case.)

SULLIVAN, J.—The defendant was tried and convicted of the crime of murder of J. C. Brady on the fifth day of July, 1901, and sentenced on December 30, 1901, to the state prison at Boise City for the period of his natural life. The defendant applied for a new trial, which was denied by the court. This appeal is from the judgment and order denying a new trial.   Fourteen alleged errors are assigned, touching the admission and rejection of testimony, the insufficiency of the evidence to sustain the verdict, the giving of certain instructions to the jury, and the overruling of the motion for a new trial.

The following facts appear from the record: That the deceased, J. C. Brady, at the time of the homicide, was the probate judge of Kootenai county; that in the summer of 1899 the defendant was brought before him on a charge of insanity; that, after the hearing, Judson Brady consigned the defendant to the asylum for the insane at Blackfoot, Idaho, and thereafter appointed one Charles L. Sherwood as guardian of the property of the defendant.   Several months after the defendant had been an inmate of said asylum, he escaped therefrom, and in a few days thereafter was apprehended at Ogden, Utah, and returned to the asylum, and remained an inmate there until the month of June, 1900, when he again escaped, and made his way back to Kootenai county, to his home or farm, near Rathdrum.   The superintendent of the asylum wrote to the sheriff of said county of defendant's escape, and requested the sheriff to keep "an eye on him"; that, if he showed symptoms of a recurrence of his trouble, to take him in charge and to notify him (the superintendent).   It also appears that after the last-

mentioned escape the defendant was in and about Rathdrum from about the 1st of June to the 5th of July, 1901, and that on the night of the latter date, at about half-past 10 o'clock, the homicide occurred. It appears from the writing introduced on the trial as the dying declaration of Judge Brady that the defendant entered the judge's office at Rathdrum about the time and date last above mentioned, and said, "How do you feel to-night?" The judge answered: "Pretty fair. How are you?" Defendant then said, "Take that in your old face," and pulled out his pistol and fired. The defendant then put out the light and left the office. The ball struck the judge in the face, under the right eye, and went almost horizontally backward, and "lodged against the brain." "The base of the skull was penetrated and fractured." It appears that the deceased, after receiving the shot, got up out of his chair, went to the door, and partly fell down the front steps, where he was picked up. The following morning, July 6th, the deceased was taken to the Sacred Heart Hospital at Spokane, Washington, and died there about half-past 6 o'clock on the morning of the 17th of July, 1901, from the effect of said gunshot wound. The sheriff of Kootenai county and his wife were occupying a room over the jail, and about fifty or sixty feet from the office of the deceased, at the time the shooting occurred, and had just retired for the night when they heard the shot. On hearing the shot, they both got up, and looked out of different widows toward the judge's office. The sheriff himself testified that he saw a man in said office immediately after the shot was fired, and, in his opinion, it was the defendant. The sheriff's wife testified that she saw a man dart around the courthouse, and stop an instant, and, on tiptoe, peek into Judge Brady's window, and that man was the defendant. Another witness testified that about half-past 10 o'clock on July 5, 1901, he was told that Judge Brady had been shot, and that he went to the sheriff's office, and on his way there, and about seventy-five yards therefrom, he met the defendant coming from said office. It appears that the defendant traveled on foot from Rathdrum to Spokane, Washington, between the night of the 5th of July

and the 9th of that month; that he did not travel on the highway, but went across fields and through the timber, and slept at least one night in a strawstack; and that he was arrested in that city on the latter date. It also appears from the evidence that the defendant imagined certain persons were trying to get his property from him, and that sending him to the insane asylum was in pursuance of that purpose, and that Judge Brady and others were connected therewith. After his return therefrom he made threats that he was going to get even with them, and particularly with Judge Brady; that he had been robbed, and wanted to get the property back; that his guardian had sold out and got away from there. Those matters evidently greatly agitated him and preyed upon his mind. The defendant pleaded "Not guilty," and interposed the defense of insanity. The jury found from all of the evidence that he knew right from wrong at the time the homicide was committed, in their verdict of guilty of murder in the second degree.

Under the first alleged error assigned, it is contended that the court erred in permitting the prosecuting attorney to indorse the names of certain witnesses on the information after the jury had been sworn to try the case. The record shows that after the jury had been impaneled, and before any witnesses were sworn, the prosecuting attorney moved the court for permission to indorse other names of witnesses on the information, and in support of such motion presented his affidavit setting forth that he did not know of said witnesses at the time of filing the information; and, upon the showing made, the court granted the motion. It is contended that the court erred therein, for the reason that by Session Laws of 1899, page 125, section 2, it is provided that the names of all witnesses shall be indorsed upon the information before the trial. Technically, the trial began when the impaneling of the jury was begun. But it is not contended that defendant was in any way prejudiced by said action of the court. The evident purpose of such law is to inform the defendant of the names of the witnesses who are to testify against him, so that he

may have an opportunity to meet and controvert their evidence. And had the defendant asked for time for that purpose, the court, no doubt, would have given it to him. The supreme court of Montana, under a similar statute, has decided that a ruling by a trial court like the one under consideration was not error. (*State v. Schnepel,* 23 Mont. 523, 59 Pac. 927; *State v. Calder,* 23 Mont. 504, 59 Pac. 903; *State v. Sloan,* 22 Mont. 293, 56 Pac. 364.)

At the time the dying declaration of Judge Brady was offered in evidence, counsel for appellant asked permission of the court to introduce testimony to show that at the time Judge Brady made said declaration he was not competent to make the same. The request was denied by the court, which ruling is assigned as error. We think it would have been proper, and perhaps the better practice, for the court to have permitted counsel then and there to introduce any competent evidence to show that deceased was not in a proper condition of mind or competent mentally to make said declaration, not believing that death was imminent—that dissolution was near at hand—at the time he made it. But the court evidently concluded that the proper time for defendant's counsel to introduce testimony on that point was after the state had put in its testimony and rested. And we do not think the defendant was prejudiced by the action of the court in that regard, as ample opportunity was given counsel to produce all of the testimony he desired to introduce on that and on all other material points.

Dr. Givens, who was medical superintendent of said insane asylum while the defendant was an inmate there, testified on the trial in behalf of the defendant; and, from his testimony contained in the transcript, I am unable to ascertain whether a single hypothetical question including the actions of the defendant just before, at, or just after the homicide, as shown by the evidence, was put to said witness. He did, however, testify that most of the time that defendant was at the asylum he had pretty clear ideas of right and wrong.

Dr. Wenz also testified for the defendant, and testified as follows: "If it was shown by the evidence that Wilmbusse on the fifth day of July of this year had entered the office of Judge Brady between the hour of 10 and 10:30 o'clock at night, and remarked to Judge Brady, 'How do you do?' and was answered: 'I am feeling very well. How do you do?'—and then Wilmbusse had produced a weapon and discharged it in the face of Judge Brady then and there, I should think the man knew whether he was doing right or wrong." This was substantially all of the evidence offered by defendant's counsel to show that the defendant was insane, and not able to distinguish between right and wrong, at the time he fired the fatal shot.

Appellant contends that the court erred in permitting witness Callahan to answer the following question: "You may state what he said to you at that time?" It appears that said witness had testified that, outside of short intervals, he had been constantly present with deceased during his last sickness; that he had a conversation with him about a week before he died; that he, in that conversation, told witness how he felt in regard to hope of recovery. And at that point in his testimony the question above set forth was asked the witness. The court permitted the witness to answer over the objection of counsel for appellant. The witness answered as follows: "I says, 'Brady, old boy, how are you feeling?' He says to me, 'John, it's all off with me.' Those were the words he used." Thereafter the witness proceeded to testify that the deceased told him substantially the same facts as are set forth in said dying declaration. The evidence, as a whole, shows that the deceased had no hope whatever of recovering from said wound from the time he was shot up to the moment of his death, and was expecting dissolution at almost any moment; that he made said statement or declaration believing that he would not recover from said wound, and made it under that belief. That being true, it was not error to admit it in evidence.

Within a few moments after the fatal shot was fired, the deceased told Sheriff Dyer that the appellant shot him, which

statement was properly received as a part of the *res gestae.* (*State v. Gilbert,* ante, p. 40, 69 Pac. 62. See, also, *State v. McGann,* ante, p. 346, 66 Pac. 823.)

Another assignment is that the court erred in permitting the prosecuting attorney to testify in regard to the dying declaration, on behalf of the state. It is shown that said declaration was reduced to writing and witnessed by said attorney. He was a competent witness to testify in regard thereto, and as to the mental condition of deceased at the time said declaration was reduced to writing and signed by him. There was no error in permitting him to testify.

It is contended that the court erred in admitting said dying declaration because it appeared that a portion of it had been prepared out of the presence of the deceased. The evidence shows that Judge Brady sent for the prosecuting attorney for the purpose of having him reduce his dying declaration to writing; that before going to the wounded man he drew what he termed the "formal" part of said declaration, and in the presence of the deceased drew the remaining part of it. It is shown that said declaration was read over to deceased after it was reduced to writing, and he signed the same as his dying declaration in the presence of John C. Callahan and James Graham, and requested them to witness the same, which they did in his presence. The fact that the formal part of said declaration was written on a typewriter, out of the presence of the deceased, makes no difference, as the main part of it was written in his presence, and the whole of it carefully read over to the deceased. The court did not err in admitting said declaration in evidence.

The ninth and tenth assignments go to the action of the court in refusing to permit the appellant to show by Sheriff Dyer that on the sixteenth day of July, 1901, and two days after said declaration was made, the deceased was in such condition and frame of mind as to render him incompetent to make a dying declaration, or to know or understand what he was doing or saying. There was no error in rejecting said testimony. The question was as to his mental condition on the evening of July 14th, when he made said declaration, and not

what it was on the 16th of July, two days after.  On the latter
date dissolution was rapidly approaching, as it is shown he
died at half-past 6 o'clock on the morning of the 17th.  He
might have been mentally competent on the evening of the
14th, and totally incompetent two days later.  The authorities
cited by appellant in support of the last assignment of error are
not in point.

The giving of several of the instructions on behalf of the
state is assigned as error.  We have carefully examined them,
and find that the instructions, taken as a whole, correctly state
the law, and are germane to the issues and evidence—correctly
state the law of reasonable doubt and the law with reference to
the plea of insanity.  We think the jury was justified in finding
that the appellant knew that he was committing a wrong, and
the difference between right and wrong, at the time he fired the
fatal shot, and the court did not err in refusing to grant a new
trial.

Some of the minor errors assigned, we have not referred to
in this opinion, but we have carefully considered each, and are
of the opinion that the judgment must be sustained, and it is
so ordered.

Quarles, C. J., and Stockslager, J., concur.