STATE OF MONTANA, Plaintiff and Respondent, *v.* WARREN WILLIAM HOLLYWOOD, Defendant and Appellant.

No. 10137
Submitted September 26, 1960. Decided December 28, 1960.
358 P.2d 437

Seth F. Bohart, Bozeman, argued orally, for appellant.

Forrest H. Anderson, Atty. Gen., Louis Forsell, Asst. Atty. Gen., Douglas R. Drysdale, County Atty., Bozeman, for respondent.

Douglas R. Drysdale and Louis Forsell argued orally for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from a judgment of conviction of murder in the first degree entered upon a jury verdict and from an order denying a new trial. The defendant received a sentence of life imprisonment.

The defendant was informed against in Gallatin County and charged with murdering one Sylvia Dudley by shooting her with a firearm.

The defendant is a man, 32 years of age. The deceased Sylvia Dudley was 43. For several years, prior to April 1959, the defendant and the deceased lived together, separating at times because of spats caused by drinking bouts by the defendant. The deceased had not been divorced from a man named Cosgrove, so the relationship between deceased and defendant can best be described as that deceased had been defendant's paramour. Some time in March 1959, the defendant moved out of deceased's quarters and lived alone. On the evening before the killing the defendant tried to speak to his

former paramour in a cafe and persuade her to return to him. She would not speak with him or agree to return to him. The defendant retired to a bar across the street where he kept an eye on the deceased and saw her leave with a party, including a new escort, William Hinson.

During that evening defendant testified he drank a large amount of liquor, and at this same time the defendant went to the home of a friend, Jose Calderon, and, without anyone's knowledge or permission, took a gun and a knife. Then he went to the apartment of the deceased and waited until the deceased, together with James Dudley, Alice Dudley and William Hinson returned in the early morning hours of April 6, 1959.

The defendant waited in the deceased's apartment for some time, leaving once, but returning. In the apartment were a daughter of deceased and one Lester Kidder playing cards. He gave the knife to Lester Kidder, displayed the gun and demonstrated that it was loaded. He also made statements about the deceased's escort Hinson, which indicated intense jealousy. During this time he played cards with Kidder and the sixteen year old daughter of deceased, winning the game. There was evidence that he was sober, though obviously he had been drinking.

When the deceased and her party returned to the apartment, the defendant went out of the kitchen into a small front room where several small children were sleeping and spoke to the deceased, saying "Hi, Sylvia" or "Hello, Sylvia". Alice Dudley and William Hinson went on through the room. James Dudley and defendant engaged in a conversation with James Dudley telling defendant he was drinking and asking him to leave. James Dudley testified that defendant, at that time, said he had a notion to kill Hinson who was then in the kitchen. According to the State's eyewitness testimony, defendant pulled a 22 revolver, the same gun he had taken from Jose Calderon's home, from his pocket and shot James Dudley, then turned and shot Sylvia Dudley, killing her. James Dudley and defendant

fought for the pistol. When the gun was found, seven shots had been fired. Sylvia was mortally hit once; James Dudley had four wounds; and Alice Dudley was hit and wounded. Meantime, James Dudley got the gun away from the defendant who then went out the front door. James Dudley attempted to pursue and tried to shoot defendant, but collapsed before he could.

In the actual shooting, the witnesses had varying versions of the number of shots fired, sequences, time intervals, etc., but substantially the story was quite clear.

After the defendant left the apartment, he went back to Jose Calderon's home, from where he had at least surreptitiously if not burglariously obtained the gun and knife. Calderon drove defendant to the police station where he surrendered himself.

Defendant testified in his own behalf, claiming he was too drunk to remember some of the events of the evening. His version of the shooting was that he only intended to frighten his girl-friend's escort to scare him away from "his woman"; that James Dudley attacked him and that the shooting of Sylvia was at most unintentional on his part, if not, in fact, done by her own son, James Dudley. Obviously, the jury in arriving at its verdict rejected his version.

There is more of the evidence that might be recited in this fact statement, such as various statements of admission, threats, etc., but for our purposes the foregoing statement suffices.

On this appeal, the defendant specifies nineteen alleged errors. He then groups his argument under topics. We shall follow the pattern of the briefs in this opinion answering contentions deemed worthy, and expanding on what we consider the important question.

First, defendant contends that the evidence is insufficient to support the verdict. In this connection he argues that it is not clear just which shot hit deceased or whether defendant or James Dudley were responsible for that shot. These

contentions were for the jury to decide. The testimony and credibility of witnesses was in the jury's province. State v. Vettere, 76 Mont. 574, 248 P. 179; State v. Robinson, 109 Mont. 322, 96 P.2d 265; State v. Strobel, 130 Mont. 442, 304 P.2d 606; State v. Alexander, 131 Mont. 97, 103, 307 P.2d 784; State v. Pankow, 134 Mont. 519, 333 P.2d 1017.

Is is urged by defendant that even so the testimony and circumstances were such that the witness's stories were incredible and inherently impossible and thus the jury's verdict would not govern as in State v. Gunn, 85 Mont. 553, 281 P. 757, and State v. Kuum, 55 Mont. 436, 178 P. 288. We find no such testimony or circumstances here. Under proper instructions the jury resolved all conflicts in the testimony.

Next, the defendant urges that the verdict of murder in the first degree was contrary to law by reason of failure to prove malice and premeditation. He urges that the court should have reduced the judgment to manslaughter. Throughout the record it is apparent that able and skilled defense counsel sought a manslaughter verdict. The State's evidence that a homicide had been committed by defendant was overwhelming. The only practical burden of proof on the State was as to the degree of homicide.

Evidence of malice and premeditation was presented. The evidence shows that the defendant cohabited with the deceased in Butte for about four years. Thereafter she left him, refused to live with him again, and refused to see him and speak with him. He moved from Butte to Bozeman to be near her and tried to persuade "his woman" to come back to him. He was jealous of her new escort, made threats toward him and stated that if he couldn't have her nobody could. He spied on deceased, then purloined a gun and knife and thus prepared himself for murder even though he claimed later he only wanted to "scare".

The evidence shows that he fired upon the deceased. He knew she was there. There was substantial, clear-cut evi-

dence of malice and premeditation upon which the jury, under proper instructions, could have and properly did find murder in the first degree.

Next, the defendant urges error in several instructions of the trial court. We have examined the instructions given and refused, and find that the trial court gave adequate and full instructions, only rejecting those covered by other instructions and not pertaining to the evidence presented.

The question mainly relied upon by the defendant is stated in his brief as follows: "The court erred in refusing to permit the defense to offer evidence of the results of a qualified polygraph examiner, voluntarily taken by the defendant and offered to be considered by the jury as other evidence pertaining to the question of malice or intent of the defendant."

Counsel urges that the constitutional guarantees of due process in Art. III, § 16, of the Constitution of Montana and Art. III, § 27, were violated. Section 16, Art. III, provides in part:

"In all criminal prosecutions the accused shall have the right to appear and defend in person and by counsel * * *."

Section 27, Art. III, provides:

"No person shall be deprived of life, liberty, or property without due process of law."

At the conclusion of the State's case, the defendant's case was presented. First, photographs of the defendant were introduced and a doctor, who examined him after his arrest, testified to the effect that defendant had received injuries in the fight with James Dudley. Dr. Cole who had examined the defendant on September 19, two days before the trial opened, and some five and one-half months after the death of deceased, on September 22, during the trial, was then called. The purpose of Dr. Cole's examination was to lay a foundation for the introduction of the results of a polygraph (lie-detector) test made on the defendant.

Thereafter, the defendant took the stand in his own behalf,

and though admitting parts of the story of the shooting, testified he could not remember some details, and specifically denied others. He denied being angry at deceased, he denied that he intended to shoot deceased or anyone else, and asserted that his only intention was to scare Hinson so that he would stay away from his "woman".

As to the foundation for the lie-detector test, counsel used the so-called factors affecting the reported 25 percent failures of lie-detection methods as listed in Henderson v. State, 94 Okl.Cr. 45, 230 P.2d 495, 501, 502, 23 A.L.R.2d 1292. Dr. Cole examined the defendant on two relatively brief occasions some five and one-half months after the crime. The doctor, among other things, observed that the defendant was of an "inferior personality" but rated him sane.

The polygraph examiner was Richard P. Walsh, Sheriff of Flathead County who testified as to his qualifications and declared the instrument as absolutely infallible. Although, he did admit that its success depended upon the examiner. He proclaimed himself as never having been wrong in 160 cases.

With this background of foundation, an offer of proof was made by defendant's counsel showing specific questions and answers touching upon certain points in connection with the crime appellant was charged with, not for the purpose of proving the innocence or guilt of the defendant; but apparently to show his intent or lack of malice and premeditation.

The questions and answers of the polygraph examination offered were as follows with the exchanges concerning them:

"Mr. Bohart: The question:

" 'Did you intend to shoot Sylvia?', with the answer, 'No, I didn't.', and the reactions or comments to these because three separate tests were run. 'Did you tell Sylvia that if you couldn't have her no one would?' The answer, 'No.', and any reaction or comment in connection therewith, and the operator's interpretation. 'Did you lie when you said all of the

shots were fired after you and Dudley started to scuffle?' Answer, 'No.'

" 'Have you ever told Sylvia that you would kill her if she stepped out on you?' Answer, 'No.'

"In other words, to save time here I would like to include any comment by the operator or any reactions as to each and all of these questions and answers.

" 'Have you deliberately lied to any of these questions?' And the answer, 'No.'

" 'Did you tell your attorney the complete truth about this matter?' And his answer, 'Yes.'

" 'Do you think all of the shots were fired during the scuffle?' Answer, 'Yes.'

" 'Did you ever tell Sylvia that if you couldn't have her no one could?' And the answer, 'No.'

" 'Were you so drunk you don't remember everything that happened that night?' And the answer, 'Yes.'

" 'Have you ever slapped Sylvia?' Answer, 'Yes.'

"And on the third test, question by the operator, 'Have you now told me the complete truth?' Answer, 'Yes.'

" 'Are you a Catholic?' Answer, 'Yes.'

"I mention that here now particularly—

"The Court: I don't want any argument just make your proof.

"Mr. Bohart: The question, 'Do you believe in God?' And the answer, 'Yes.' 'Do you remember shooting Dudley?' Answer, 'No.'

" 'Do you remember having a knife at any time that night?' Answer, 'No.' 'Have you deliberately lied to any of these questions?' Answer, 'No.'

"And then the conclusion of the operator—examiner. There is a very sharp difference between those words as far as polygraph people are concerned. After careful analysis of the subject's three polygrams it is the opinion of the examiner that the subject was telling substantially the truth both dur-

ing his examination and interrogation. It is the opinion of the examiner that subject was under the influence of alcohol to such an extent that he only partially recalls the happening of that night; that he's truthful in stating that he had no intention of hurting anyone but wanted to scare Hinson with a gun so that he would leave his 'woman' alone.

"The Court: Now your purpose of offering that, Mr. Bohart, will be what?

"Mr. Bohart: Solely as evidence of the kind and nature it is for whatever it may be worth, and not for the truth of it, going at least in part to substantiate the statements made by this defendant, or giving the jury an additional means by which they might test his credibility; his truthfulness as he appeared as a witness on this stand.

"The Court: Do you have any objection to that, Mr. Drysdale?

"Mr. Drysdale: Yes, sir.

"The Court: All right. Let's hear your objection. First, let me put a question to Mr. Walsh.

"By the Court:

"Q. The questions that Mr. Bohart read to the court in his offer of proof were they the only questions you asked this man? A. No, sir; there were a great number of intermediate questions.

"Q. There were a great number of intermediate questions so the pattern is not correctly given by Mr. Bohart when he makes his offer of proof? A. That's correct.

"Q. Now let me ask you the second question: Assume that the man is intoxicated—I'm not talking about degrees, I don't agree with the county attorney that there are degrees of intoxication—let's assume that the man is intoxicated at the time of the alleged happening and you examine him on the polygraph to find out what actually happened. Now what will your examination show do you think? A. It will show that the subject does not remember certain things that happened that night.

They were questions bearing directly on that and other controlled questions. That is where the—

"The Court: Let me ask you this question, Mr. Drysdale, how would—assuming that these questions that Mr. Bohart has read are the skeleton or bony framework of these interrogations, the basic information questions and answers, how would that prejudice the position of the state if they were admitted?

"Mr. Drysdale: All right. First I might point out that there is another case, People v. Aragon, 154 Cal.App.2d 646, 316 P.2d 370, wherein it was held, 1957 case, the court stated that a lie-detector is not yet reliable. We have no evidence of any drastic change I think in the last two years.

"Mr. Drysdale: The plaintiff objects to the admission of evidence of the result of the lie detector examination and to the offer of proof on the following grounds:

"Firstly, there has been insufficient foundation laid for its admission in that it has not been shown that the polygraph is an accepted, scientifically reliable method of ascertaining truth or deception.

"Secondly, insufficient foundation has been laid for the admission of the results of the polygraph test on the grounds and for the reason that no testimony has been introduced in regard to the lie detector tests showing general recognition of efficacy;

"Thirdly, the evidence would serve to distract the jury;

"Fourthly, the test is an extra judicial test without opportunity for similar examination by the prosecution;

"Fifthly, opportunity of cross examination was not afforded by the polygraph test of the defendant and denies the plaintiff the right of cross examination;

"Sixthly, the so-called test invades the province of the Court and jury;

"Seventhly, the results of the polygraph test will admit self-serving declarations on the part of the defendant; and

"Lastly, the defendant by his own evidence has shown that he is one of a class of which such tests lack efficacy in that it has been shown that the defendant suffers from an inadequate personality or psychoneuroses, or psychopathic personality and is emotionally unstable.

" (Mr. Drysdale argued in opposition of the offer of proof.)

"Mr. Drysdale: May I ask Mr. Walsh one question?

"The Court: Yes.

"By Mr. Drysdale:

"Q. Mr. Walsh, would you have framed your questions differently—when did you make this set of questions up? A. After I talked to the subject in the room.

"Q. And how long had you talked to him? A. I believe I got the exact time; it is about twenty-five minutes on getting as much as I could that he would offer there.

"Q. And at that time you had no idea of any abnormality? A. No; that's why we had the examination.

"Q. And you did not formulate your questions as you would have had you known, as the doctor testified, you would have formulated your questions differently as the doctor testified that he was a person of a psychopathic personality? A. I possibly would have, yes.

"Q. And so would you be completely satisfied with this examination now that you know that you were dealing with a man who has been diagnosed as having an emotional disturbance or psychopathic personality? A. Yes, I certainly would.

"The Court: As I understood you put the question directly to Mr. Walsh. I understood, that when he talked to the subject, from his experience, limited or otherwise, from his experience, that I have to take into consideration of 160 cases—

"Witness: Approximately.

"The Court: (Continuing)—approximately, and his study at both of these schools, that he felt he was an inadequate personality.

"Witness: In this respect; that he was a hard person to

adjust; he more or less had a kind of an inferiority complex, is the way the subject appeared to me.

"The Court: I assumed you interviewed him with that in mind?

"Witness: Yes. I was primarily concerned with the questions there of did he intend—did he go there with the specific intent of shooting her or shooting anyone.

"By Mr. Drysdale:

"Q. Mr. Walsh, now it wasn't clear—we got kind of broken off there—had you known, or had the doctor told you *he* was a psychopathic personality, or, well, he said the other term, which is synonymous—A. (Interposing) Not prior to the testing.

"Q. I say, would that have made a difference in the formulation of your questions? A. I don't think so. I believe the particular questions that I asked in this case appear to me to fit the type of this particular individual.

"Q. But had you known he was a psychopathic personality would you have used a different—

"The Court: I think he's answered you, counsel. Maybe he's not answered like you want him to.

"Mr. Drysdale: He had said that he was unsatisfied. Didn't you?

"Mr. Bohart: I object to the question as repetitious and repeated about three times.

"Mr. Drysdale: Well, I asked him before, was he satisfied with the examination in light of what you know now?

"Witness: Yes.

"Mr. Drysdale: That is all I wanted to know. If the court's aware of that * * *.

"The Court: Yes, I am. (Mr. Bohart argued in support of his offer of proof.)

"Whereupon a recess was here taken, pursuant to which the following proceedings were had:

"The Court: You let your record show, Mr. Bickley, the jury is still absent.

"(Defendant and all parties present except the jury.)

"(Mr. Bohart argued further in support of his offer of proof.)

"(Mr. Drysdale argued further in opposition to the offer of proof.)

"Mr. Bohart: If the court please, in connection with my offer, I didn't mean—I wasn't intending to short circuit or to limit my offer. When I first made it I thought I was offering all of the relevant and material part. It's come to me from the argument, and one thing and another—I might be incorrect in that—but it has now come to *be* because there seems to be some objection that it is not complete, I now offer to introduce every question relevant or irrelevant. We go right down through the test from start to finish.

"The Court: Mr. Walsh, as the operator of the polygraph, and as the one who gave this particular test, if you were to summarize the result of the test it would be that this defendant did not know what was happening when he was in that apartment, is that right?

"Witness: He knew part of what was happening. One particular question with reference to the knife the subject told me prior to the test that he didn't even remember having that knife that night. And that was one of the questions, if he remembered having the knife, and I'm positive the man didn't remember that part of the evening or of having the knife, and I'm positive the man didn't remember that part of the evening, or of having that knife. I believe there were possibly blank periods. Now I was asked by Mr. Bohart to run this examination to determine certain things. One, did he intentionally go over there to shoot the deceased—did he intend to shoot her—and I was able to determine, in my opinion, that the man went over there with the intention of either scaring or possibly even shooting this man Hinson, but that he did

not have any intention of shooting her. The questions were asked directly and specifically and that's why I brought in the remembering and use end of it. I told Mr. Bohart in advance that the test could well come out the other way; that I was going to call them exactly as I saw them. He said, 'Well, * * *' —well, just as far as he said, I didn't ask for a half pie I wanted the whole thing. So three actual tests were run. The first test there were specific reactions to certain questions and I had to determine why these reactions occurred. The second test, there were specific reactions. One of the reactions was caused by a truck going by on the street that backfired, that caused a specific reaction. On the third test that I ran after the interrogation I asked direct and to the point questions. There was no specific reactions to the relevant questions.

"The Court: I can't see that admitted results of this lie-detector add anything to the defendant's testimony. He has so testified that he didn't know about the knife; that he never remembered that; that he went over there with the intention of frightening or, at least, teaching Hinson not to bother with his woman; that he never intended to shoot the deceased; that he doesn't recall except there's a fusillade of bullets going off. And, if I admitted this, all it would be would be in effect a corroborative witness. In other words, you bring in a silent witness here who apparently corroborates what he's already testified to. I don't see that it adds anything to the record. There is no question that there is this conflict between what happened as to the various stories of what happened. The objection is going to be sustained. It will not be admitted. Call the jury back."

We will not burden this opinion with a discussion of the foundation attempted. We shall comment by repeating what the Oklahoma Court of Criminal Appeals said in Henderson v. State, supra, relied upon by defendant.

"* * * we are of the opinion that the foregoing enumerated difficulties alone in connection with the lie detector use present obstacles to its acceptability as an instrument of evidence in the trial of criminal cases, notwithstanding its recognized utility in the field of discovery and investigation, for uncovering clues and obtaining confessions. This conclusion is in line with the weight of authority repudiating the lie detector as an instrument of evidence in the trial of criminal cases. In addition to the foregoing conclusion, they give other cogent reasons for its inadaptability as an instrument of evidence in the trial of cases, such as the impossibility of cross examining the machine, (a constitutional impediment), also pointing out those human elements of fallibility which surround interpretation of the lie detector recordings. * * *

"'We see no reason why, under the circumstances of this case, the result should have been admitted. There was no testimony offered which would indicate that there is at this time a general scientific recognition of such tests. Until it is established that reasonable certainty follows from such tests, it would be error to admit in evidence the result thereof.' [People v. Becker (1942) 300 Mich. 562, 2 N.W.2d 503, 505.]"

See annotation in 23 A.L.R.2d 1292, for discussion and other authorities.

Aside from the general refusal to admit such tests as evidence, in the instant case, further reasons for its lack of reliability appear.

The test was given five and one-half months *after* the crime to which it referred. The questions went to intent. Undoubtedly remorse, desire, repeated questioning as herewith, repeated denials, as well as other human emotions would make any man honestly wish he hadn't accomplished the crime. Therefore, he might at the later date be completely truthful in saying *as of that time* that he did not intend to kill. At most the responses were merely self-serving declarations.

The trial court did not err in denying the offer of proof and denying a new trial.

The judgment is affirmed.

MR. CHIEF JUSTICE HARRISON and MR. JUSTICES ANGSTMAN and ADAIR concur.

MR. JUSTICE BOTTOMLY dissenting.