THE STATE OF MONTANA, Plaintiff and Respondent, *v.*
PAUL D. COR, Defendant and Appellant.

No. 10462

Submitted June 15, 1964. Decided September 22, 1964.

Rehearing denied November 16, 1964.

396 P.2d 86

J. B. C. Knight, Knight & Dahood, Anaconda, Wade J. Dahood (argued), Anaconda, for appellant.

Robert J. Holland and David L. Holland (argued), Butte, Donald A. Douglas (argued), Helena, for respondent.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is an appeal from a verdict of guilty of murder in the first degree in a case tried in Silver Bow County before the Honorable John B. McClernan. The defendant was sentenced to life imprisonment in the State Penitentiary. This appeal seeks a reversal of the judgment and sentence entered thereon.

The appellant contends that the trial court made numerous errors, which he combines into eight specifications of error in this appeal. It is our view that the dominant error alleged is the insufficiency of the evidence. Appellant moved at the close of the State's case to advise the jury to acquit on the grounds of lack of evidence, and again at the close of the case a motion for a directed verdict and a motion to advise the jury to acquit were made by the appellant on "insufficiency of the evidence as a matter of law to justify submission of the case to the jury." All motions were denied.

It is appellant's contention that the trial court erred in denying its motions and that the verdict must be set aside.

There is no serious contention that the State failed to establish the corpus delicti. While not going into the details of the case at this point we hold that by the evidence, both direct and circumstantial in nature, the State proved, prima facie, that Sheri McEwen died as a result of a criminal act.

The important issue is whether the State established, prima facie, that it was Cor who committed the act. The evidence in this regard was virtually circumstantial, there being no witnesses to the homicidal act, no confession, no fingerprints, no weapon found—a situation not uncommon in homicide cases.

A careful and thorough consideration of the record convinces us that there is more than sufficient evidence to support the verdict of the jury and the judgment entered thereon, and this even though the evidence is circumstantial in nature. To give meaning to this conclusion and to demonstrate its application to the case before us, the evidence given at the trial will be set forth in some detail. However, before doing so it is deemed advisable to comment at the very outset as to the inherent nature of circumstantial evidence, and its standing in a criminal proceeding.

In 20 Am. Jur., Evidence, § 273, p. 261, is set forth this general rule:

"In the absence of statutory enactment * * * it may be stated as a general rule that whatever may be established by direct evidence in a criminal case may also be established by circumstantial evidence. [noting that] The rule is one of necessity; [as] only few convictions could be had if direct testimony of eye witnesses were required." This is a common sense rule necessitated by the obvious, i. e., crimes are frequently committed at a time and place where no observers are present and though some accused of crime do "confess" many do not. This same authority states that "Circumstantial evidence in criminal cases may be fully as satisfactory as positive testimony and will sometimes even outweigh it."

The foregoing rule is not new but one of long-standing. Vol. 2, Wheeler's Criminal Cases at page 462, note, quotes Justice Park in his charge to the jury in the case of King v. John Thurtell (Jan. 1824):

"The eyes of Omniscience can alone see the truth in all cases; circumstantial evidence is there out of the question; but clothed as we are with the infirmities of human nature, how are we to get the truth without a concatenation of circumstances? Though in human judicature, imperfect as it must necessarily be, it sometimes happens, perhaps in the course of one hundred years, that in a few solitary instances, owing to the minute and curious circumstances, which sometimes envelop human transactions, error has been committed from a reliance on circumstantial evidence; yet this species of evidence, in the opinion of all those who are most conversant with the administration of justice, and most skilled in judicial proceedings, is much more satisfactory than the testimony of a single individual, who swears he has seen a fact committed."

Circumstantial evidence is not always inferior in quality nor is it necessarily relegated to a "second class status" in the consideration to be given it. The very fact it is circumstantial is not a sufficient allegation to justify a reversal of the judgment for such evidence may be and frequently is, most

convincing and satisfactory. In any criminal case, evidence that is *material, relevant* and *competent* will be admitted, "nothing more and nothing less." The test is whether the facts and circumstances are of such a quality and quantity as to legally justify a jury in determining guilt beyond a reasonable doubt. If such be the case, then the court should not, indeed cannot, set aside the solemn findings of the trier of the facts. State v. Espelin, 106 Mont. 231, 76 P.2d 629; State v. DeTonancour, 112 Mont. 94, 112 P.2d 1065.

In the light of these principles what are the *known* facts in the instant case which when *tied together* led the jury to its conclusion that Paul D. Cor murdered Sheri McEwen and because of their incriminating nature exclude every rationale (i. e., reasonable) hypothesis other than that of guilt? Let us examine the record.

On the evening of June 10, 1960, Sheri McEwen, a fifteen year old girl, disappeared from her home in Walkerville, Montana. Her badly decomposed body was found on June 25, 1960, some one and one-tenths miles from the home of the defendant, which was located outside the Butte city limits in a rural area. The defendant was the last known person seen with the deceased. He called at her home between 9:00 and 9:30 p.m. the evening of June 10th and asked her out, to go riding. She left her home at 9:30 p.m. and in spite of the numerous witnesses who came forward, much later, to say they had seen her alive after June 10th this was the last time she was seen alive by anyone other than the defendant Paul D. Cor.

When her body was found on the 25th, partially covered by sand, it was determined that she had been shot five times in the back. Four bullets penetrated the lower part of the spine; two on each side low and close to the spine, and one in the base of the skull. The pathologist, Dr. Raymond Peterson, gave the cause of death as multiple bullet wounds in the back. In his opinion she could have run for some distance with some or all of the bullet wounds in her back, but not with the head wound.

This fact is important in considering later evidence introduced by the State. In addition, Dr. Peterson testified that the girl's stomach contained a cupfull of partially digested food which included well preserved slices of pineapple. Sheri's mother testified that she had eaten a pineapple and cottage cheese salad between 4:00 p.m. and 6:00 p.m. on the 10th. The pathologist's testimony concerning this food was as follows:

"Q. Besides how much the body decomposed, Dr. Peterson, this evidence relative to the contents of the stomach, would that give you any indication of how long this girl died after she had taken in her last meal? A. Yes, we can say pretty definitely that she died within a few hours after she had eaten the pineapple.

"Q. Now, relative to these questions that Mr. Shone has asked you about possibilities of six or seven hours, what are the probabilities? A. Well, the probabilities are that she died within a few hours after the pineapple was ingested, because after death the digestive process stops and then the food is preserved in more or less the same state for some period of time until other degenerative processes set in."

Testimony was also given by Dr. Peterson that although the body was badly decomposed no evidence of pregnancy was found. In attempting to ascertain the approximate date of death, the doctor stated that it was impossible to pinpoint the exact time of death due to the variables of weather, cover and other conditions, however he did testify as follows:

"Q. Now, from your examination of the body and the amount of deterioration present could Sheri McEwen have been dead since the night of June 10, 1960? A. Yes.

"Q. There is nothing inconsistent in those findings at all? A. No, sir."

In addition to testifying about the condition of the body, Dr. Peterson testified that three bullets were removed from the body and that they were apparently .22 caliber although two of the bullets were deformed there was one well preserved

and it was later identified by Mr. Poppleton, an F.B.I. ballistics expert as a .22 caliber bullet. He also testified that the other two bullets were of the same caliber.

The testimony of numerous witnesses was that the Cor family had a .22 caliber Iver Johnson hand gun that had been around the house for several years and that this gun disappeared about the time of the death of Sheri and had never been found.

In June 1960, Paul D. Cor was 21 years of age. He had lived with his family in Butte, Montana, since the age of three. He attended the local schools and completed his Sophomore year in high school. In 1956 he enlisted in the Marine Corps from which he was discharged into the reserves in January of 1959. He had an honorable discharge. He returned to Butte when discharged to live with his family. During this period he held several jobs and in June of 1960 was unemployed though he helped his parents look after the Butte Trap and Skeet Club where the family lived. During the period prior to June 10th he had dated Sheri McEwen. That evening he drove up to the McEwen home in Walkerville, a town immediately adjacent to Butte, in a 1952 G.M.C. truck that had been purchased on contract on April 28th, less than a month and a half before June 10th. After getting the truck, the defendant and his father built a new rack on the back of the truck some four feet high and six feet in length that completely encased the rear portion of the truck when the tail gate was up. The defendant testified that with his father he had painted it, the new rack, black, inside and out, before the 10th of June. This truck and the bullet holes later discovered, one in the door and one in the rack, played an important part in the case.

On arriving at the McEwen home, the defendant testified that he parked near by, watching Sheri swing for a few minutes, and that after watching her she went into her house. Soon after one of the fifteen McEwen children came out to find out what he wanted and he asked her if Sheri was home. She finally came out, they talked for a few minutes, and he asked her to go for a ride, but she had to get her mother's permis-

sion before going. Her mother testified that she asked if she could go for a bottle of pop with Paul Cor and that she had given her permission, when Sheri said "All right mother, I will be right back."

The mother testified that she left without powdering her nose, without taking the bobby pins out or tying a scarf on her hair, that she did not take a purse with her, that she was dressed in an inside pink slip, a white full slip, a pink full slip, a little white outside skirt with an orange and black design and white ballerinas and with no bobby sox.

Paul Cor testified that he drove to a local parking place, out under the big M where he parked for a period from twenty minutes to an hour. While this parking place is isolated and secluded it was within from five to eight minutes driving time from the McEwen home.

From this point in the case, the testimony of the defendant, and the testimony supporting the theory of the State's case became totally different.

The defendant stated that after parking he drove into downtown Butte and that as he was driving a car went by and honked at them, that Sheri asked him to stop so he pulled up behind the car and Sheri got out and talked to the people in the car for several minutes. He said he did not know who was in the car, but that they made a lot of noise. His description of the car and the year model varied but he always said it was a Ford. After talking to the occupants he said Sheri got into the truck and he told her he was taking her home, but that she asked to be let off at the bus depot. According to the defendant he dropped her off there about 10:30 p.m. and that was the last time he saw her. He testified that he drove home arriving there at about 10:45 p.m. though the time of his arrival home varied in statements given the police and sheriff from 10:45 to 11:15 p.m. The defendant stated that the first time he knew Sheri was missing was when her sister Rosie called him the next morning to ask him where she was and that

he told he he had let her off at the bus depot. For the next fifteen days he heard nothing more until the body of Sheri McEwen was found about a mile from his home on the 25th. From that point on through the inquest and finally to the filing of the information on September 15, 1960, the defendant heard much about Sheri McEwen.

The various statements made by the defendant commencing on the day of the discovery of the body of Sheri McEwen, both verbal and written, were given in full to the jury for its consideration. That they varied in detail is understandable, but one factor in the defendant's case remained constant, his insistence that he let Sheri out at the bus depot.

As previously noted, the case presented by the State hinged on a great many circumstantial factors plus the variance in the stories given by the defendant and his family.

Prior to considering the evidence, we will consider two rather bizarre occurrences, but which we find had nothing to do with the case.

On June 25, 1960, a body was found near the Butte Skeet and Gun Club with a bullet hole in the heart, and evidence that the victim, Emil Bruin had tried to emasculate himself. The gun, which had been purchased the day before on June 24th was sent to the F.B.I. laboratory and was cleared as a possible death weapon of Sheri McEwen. It was during what proved to be this suicide investigation that the officers received a radio call from the sheriff's office that a railroad engineer had seen a partially covered body, which turned out to be Sheri's, not far from where the officers were completing their investigation. They immediately investigated this report and found the body of Sheri McEwen. The body was completely nude except for having a pair of panties tie daround her ankles.

The second diversionary feature allowed to be introduced by the defendant was the shooting of defendant's Uncle, Charles Cor, on the evening of October 6, 1960. That evening Mr. Cor was working at a service station when a Dennis Sullivan robbed

or attempted to rob the station and in the commission of the crime he brutally shot Charles Cor six times with a .32 automatic. The only possible reason to allow this testimony was that Dennis Sullivan had been seen with a group of teenager friends of Sheri McEwen and who one witness said had dated Sheri. Proper objection was made by the State to the testimony but the testimony was allowed if it could be connected to the case. It never was connected.

Having discussed the first three factors of the State's case, we will not refer to them again except insofar as the thread of the circumstantial case is woven.

During the course of the invstigation two bullet holes, of approximate .22 caliber size, were discovered in the truck. One in the door on the driver's side and one in the box part of the truck. The door was taken off the truck in an effort to locate the bullet, for it did not go through the door, but this was unsuccessful for before they got the truck defendant and his father had repaired the door with a nut and a bolt and painted it. Sheriff Dick Walsh testified that when he interrogated him the defendant said that he had repaired the door while his father was in the hospital because he thought his father would be angry with him. The defendant's story of how this hole occurred was that he accidentally shot a hole in the door on June 9th while either loading or unloading the gun near his home. His story was substantiated by the testimony of his mother, brother and friends who said they heard him talk about this accident on the 10th. However, the investigating officers testified when asked about the hole in the door that the defendant couldn't give them a date as to when it happened.

Concerning the bullet holes in the rear box of the truck the defendant made no explanation. True, they were not discovered at the time the truck was impounded for investigation, and not until sometime in August after the truck had gone back to the dealer and been resold, did Deputy Sheriff Duckham find this evidence. In answer to a question concerning this evidence he stated:

"A. Well, there were plugged holes in the truck that I seen. It looked like a bullet had entered the left side of the truck into the left board, and the back end of that board was splintered. The splinters were removed and painted over; and on going into the left-hand board at a little angle, a little higher up than on the right board, there was something entered there and came out the left hand side and splintered there and the splinters were removed and painted over, and this hole was plugged. It appeared to be the size of a .22 caliber bullet.

"Q. And on the right side, the exit part of the hole, did you see there different than on the entry side of the right hole? A. Well, the holes were rounder and that side was splintered, and there it had been splintered and the splinters had been removed."

Neither the auto agency nor the new owner of the truck could give any explanation of the holes and both denied ever fixing them.

The finances of the Cor family during this period of trading trucks was most precarious. The father was in ill health, had not worked steadily and were it not for the mother's efforts they would have been in great need. Yet they had several cars and were allowed to get the G.M.C. truck—all on time pay, which in their case was mostly time and little pay. On April 29, 1960, the local bank financed the purchase of the 1952 G.M.C. The need for the truck according to the testimony of the Cors was to clean up and carry away debris from the Skeet and Gun Club. The 1952 G.M.C. was kept by the Cors exactly two months to June 28, 1960, eighteen days after Sheri McEwen's disappearance, three days after her body was found, and on that day the 28th of June the truck was returned to Wilson Motors of Butte and the Cors financed through the bank, a 1955 Ford eight-cylinder, F-100—half-ton pickup. While no reason was given at the time for trading in the G.M.C. the Cor family testified it was losing oil. Mr. Rask, the Wilson Motor Company salesman, testified he sold both trucks to Mr. Cor,

that no complaint was made about the G.M.C. using oil; that he did not notice the bullet holes at the time the Cors brought the G.M.C. in for trade; that the truck had been repainted and had a different rack on it than it had in April and that the reason given for trading it in was to get a smaller truck.

Immediately after the finding of Sheri McEwen's body on June 25th, the law enforcement officials interrogated Paul D. Cor and impounded the G.M.C. As part of the investigation procedure they examined the truck and had the bed and cab of the same vacuum cleaned. The contents of the vacuum cleaner bag were turned over to Dr. John Newman in two separate packages. They were also sent to the F.B.I. laboratory. In addition a pocket knife of defendant was submitted for examination but the results of the knife examination were inconclusive. Testifying as to the debris from the bed of the truck Dr. Newman said:

"A. I emptied this out on the counter and went over it real carefully with a magnifying glass and I could identify some dirt and some material which appeared to be coke or cinders, some small pieces of wood, one rusty screw, some wood fibers, brown pine needles, some white material and one small chip of quartz. I also found three or four bits of reddish material which appeared to be red paint, but I could find nothing under the magnifying glass which appeared to be blood.

"I then took thirteen random samples which I grossly picked from here and washed these in distilled water and tested them for blood, and I got a positive test on this that ranged from slightly positive to moderately positive.

"Q. Dr. Newman, is it your opinion that those samples contained blood? A. Yes, sir.

"Q. Did you have sufficient material to test to enable you to determine whether it was the blood of a lower animal or that of a human being? A. No.

"Q. And in that test which was performed by you on this

debris, the test for blood, you get the same reaction if the blood is animal or human blood, is that right? A. Yes.

"Q. On what date was that examination performed Dr. Newman? A. That was on June 30, 1960."

Certainly this evidence and the admission by the defendant that he had cleaned the truck out some days prior to June 28th was damaging to defendant.

The defendant's explanation that they had carried animals that had been dead for sometime out to the dump did not explain the blood samples found.

Two F.B.I. experts testified, one Poppleton on ballistics, and the second Semmes on body fluids and blood stains. The testimony on ballistics showed that the three bullets in Sheri McEwen's body had been submitted for identification. Without going into a lengthy review of the testimony the State established that the bullets were .22 caliber and from a study of the "lands" and "grooves" showed some five lands and grooves, right twist. That the weapons that would create such marks could be the "Ruger," an "Iver Johnson" and a few guns made by Harrington & Richardson. Also that a Sable, imported into this country by Newman & Company would fire such a marked bullet, but that they are so scarce that he had never seen such a gun. When asked whether or not the previously described gun owned by defendant's father, an Iver Johnson revolver, could have fired the bullets taken from Sheri McEwen's body the answer was "yes."

Agent Semmes' testimony concerned itself with the clothing of deceased, which was found early in November in the area where Paul Cor said they parked. Concerning the panties found tied around her ankles he testified:

"A. I examined them for the presence of semen stains.

"Q. And would you please tell us what test or tests you gave that, what's the technical name for those tests? A. Well, the specific test I ran was a chemical test, which is called the Florence test, and I also ran a microscopic test in an effort to

identify the male reproductive cells which are called spermatozoa in the semen.

"Q. What is semen? A. Semen is the male reproductive fluid, and it contains the male reproductive cells, called spermatoza.

"Q. Mr. Semmes, what did your check of this garment show? A. Well, I was unable to identify any spermatoza in the stains present in the pants; but I did run a chemical test on some stains on the panties, and on a stain which was present on the front area of the panties above the crotch, and on a stain which was located on the front of the panties near the upper edge, as well as another stain on the side near the edge of the panties, my chemical tests were positive, indicating that these possibly were semen; but I couldn't confirm it definitely as semen by finding the spermatozoa in the stains, which is the only means of definitely confirming it in a stain, and there are many reasons why spermatozoa might not be in a stain such as this.

"Q. What could cause the fact that spermatozoa were not present in the semen stain? A. Well, it could be due to the fact that there were never any spermatozoa in the semen of the person who made the stain, or it could be due to the bacteria destroying the spermatozoa, as spermatozoa are very fragile and very subject to destruction by bacteria; and if a garment were out in the weather and had been exposed to the elements for a long time certainly that would destroy the spermatozoa."

He further testified in examining the clothing he found bloodstains of human origin on the skirt, blood stains on a half slip, on two crinoline skirts, and on the outer skirt. He was unable to find blood on the shoes or brassiere.

As previously noted all of Sheri McEwen's clothing, except her panties, were found on November 6, 1960, by a man out hunting rabbits in an isolated area covered by sage brush. They were found some 75 feet off a road, approximately three miles from where the defendant said he parked with Sheri on the

evening of June 30th. The skirt and slips were bundled together, a white blouse was nearby against some sage brush as was a brassiere. When they saw blood on the clothing they immediately reported to the sheriff's office and the clothing was identified by Mrs. McEwen as being worn by Sheri when she left home. A white plastic belt, with a piece broken off the front, that belonged to Sheri, was later found down the road. Her shoes were found in the same general area where the belt was found.

Throughout the investigation, statements written and oral were taken by the law enforcement officials from the defendant which varied from statement to statement in minor and major details. They concerned the time he went to the McEwen home, how long he parked, where he parked, the details of the alleged car that Sheri got out of the truck to talk to its occupants, the time he got home, the bullet hole in the door of the truck, the missing Iver Johnson revolver, and others. These variances and the defendant's explanations were fully presented to the jury for its consideration as the fact finding body, and their decision is controlling.

The testimony of the McEwen family, father, mother, sisters and brothers-in-law, fill the picture of the girl's family and what happened after her disappearance on June 10th. The mother's testimony concerned the defendants picking up her daughter, how she was dressed, the later identification of the girl's clothing, and the search made by the family on the days following the 10th. This testimony was confirmed and enlarged upon by the family.

Soil specimens of the area where Sheri McEwen's clothing and belt and where her body was found were introduced by the State in proof of its theory of the homicide that the area where they contend she was murdered was too hard geologically to have buried the body, and showing the area where she was found some eight and eight-tenths miles away and just one and one-tenth of a mile from the Cor residence, to be of a loose sandy

composition. The samples taken from the area where the clothes were found had to be secured by using a pick. Mr. Dwyer, the assistant county surveyor, who obtained all the samples described the clothing area as being one of large rocks, ground so hard that it was necessary to secure samples by a pick, and that this was true winter or summer.

Missing from the State and the defendant's case was the Iver Johnson .22 caliber revolver. The defendant admitted having the gun on June 9th for this is the day given by him as being when the revolver went off and made a hole in the truck door. It was missing on the 26th of June when his first serious interrogation occurred. The testimony of the Cor family concerning the Iver Johnson revolver was that a son Stanley gave Mr. Cor the gun about 1956 or 1957. The gun had been around the house since then and until it was found missing had been in a leather holster that hung on a door in their home. The defendant, the Cor family, and friends of the family testified that when they looked for it around Father's Day, which was June 19th, it was missing.

It should be noted that the attorneys who represented this defendant before this court did not represent him in the trial of his case in, the trial court. His trial counsel are outstanding trial practitioners and ably defended him. His appellate counsel also ably argued his case before this court.

Eight specifications of error are assigned by the defendant in his appeal.

1. Where a jury of twelve is not sworn as in this case, (the twelve jurors, as hereinafter will be explained, were sworn) and an alternate juror is selected in violation of statute, the defendant has been denied a fundamental constitutional right and the verdict and judgment must be set aside.

2. Where a biased juror is allowed to serve, this is fundamental error as it deprives the defendant of a fair trial by an impartial jury and the verdict and judgment must be set aside.

3. The trial court committed prejudicial and reversible error

in refusing defendant's requested instruction on character evidence as offered by the defendant and said proposed instruction reads as follows:

"Certain witnesses have testified in this case as to the general good reputation of the defandant and this character of testimony is regarded by law as relevent to the question of whether defendant is innocent or guilty of the crime charged in the information, because the jury may, if its judgment so directs, reason that it is improbable that a person of general good reputation would have conducted himself as charged. Evidence of general good reputation *of itself* may be sufficient to raise a reasonable doubt whether or not defendant is guilty, which doubt otherwise would not exist. Testimony that a witness has known defendant for some length of time in this community but has never heard defendant's reputation discussed by anyone, is evidence of good reputation and you should consider such evidence in connection with all the other evidence in this case."

4. The court committed prejudicial and reversible error in not giving the requested proposed instruction that absence of motive on the part of the defendant is a circumstance in favor of his innocence and said proposed instruction reads as follows:

"You are instructed that absence of motive on the part of the defendant to commit the crime charged, is a circumstance in favor of his innocence, and, in this case, if the Jury finds, upon consideration of all the evidence that it fails to show any motive on the part of the accused to commit the crime charged against him, then this is a circumstance which the Jury ought to consider in connection with all the other evidence in the case in arriving at their verdict."

5. The evidence, which is completely circumstantial, is insufficient as a matter of law and the verdict and judgment must be set aside and nullified.

6. Prejudicial error was committed when the State in the presence of the jury, referred to lie detector tests taken by Paul

Cor—and the trial court agreed that such error had been committed.

7. Prejudicial error was committed in permitting a deputy sheriff to give his opinion that Paul Cor murdered Sheri McEwen—this deprived Paul Cor of a fair trial.

8. The motion for a new trial should have been granted for the reason that the newly discovered evidence would probably result in the acquittal of Paul Cor.

Concerning specification 1 we find no merit in defendant's allegation. In any difficult case, particularly a homicide case, the trial of which took thirteen days, it could hardly be said to be free of error. Our Constitutions, both Federal and State, guarantee a fair trial, not a perfect one. This court in State v. Noble, 142 Mont. 284, 304, 384 P.2d 504, recently said:

"It is the duty of this court to ascertain whether or not the errors are prejudicial for only upon such errors may a case be returned to the district court for retrial." State v. Totterdell, 135 Mont. 56, 336 P.2d 696.

Here, twelve jurors were selected and seated; the thirteenth juror, the alternate, was drawn, examined and passed for cause. Then the twelve jurors were sworn, but the thirteenth juror was not sworn. The sworn jury was excused to return later, did return, and then the thirteenth juror was sworn. The record shows that all thirteen jurors were not sworn together as defendant contends the statute requires. The only departure from the statutory procedure for selecting of alternate jurors was the drawing of her name and her examination on voir dire prior to the swearing in of the jury of twelve.

It is to be noted from the record that the alternate juror did not go into the jury room with the jurors after the case was submitted, nor did she have any voice in the verdict. Just where the irregularity complained of by the defendant prejudiced the defendant or affected his substantial rights we are unable to discover. Certainly, such irregularity is insufficient cause to reverse the verdict appealed from.

The second specification of error is directed to the alleged bias of Juror Tamietti. The defendant in setting forth part of the voir dire examination of Juror Tamietti points out that this juror was drawn after the defense had exhausted its peremptory challenges and that during the examination he had been challenged by the defense for "actual bias and existence of a state of mind on the part of the juror in reference to the case against this particular defendant which will prevent him from acting with entire impartiality, to the prejudice of the substantial rights of the defendant."

The court immediately questioned the juror and the following examination took place:

"COURT: Mr. Tamietti, can you set aside these things and try the case as it is produced in court and in accordance with the instructions of the court? A. I could, yes sir.

"Q. Well, you said you might require that the defendant produce more evidence or evidence of greater weight than it would if you hadn't talked with these State witnesses? A. Not necessarily no.

"Q. Have you some bias or prejudice in this case?. A. No sir.

"Q. Do you favor at this time one party against the other party because of these conversations? A. No, I don't.

"Q. Now, do you know of any reason why you could not act as a fair and impartial juror in this case? A. I don't see any reason, no.

"Q. If you were a defendant, charged with the same offense, would you want a juror to set on your case who was in the same frame of mind you are now in? A. Sure.

"Q. You would? A. Yes, sir.

"Q. Now after the State's witnesses have testified, all these men and women you have consulted with about the case, do you think you could give the defendant a fair trial? A. I know I could. Sure."

The questioning went on bringing out the fact that Juror

Tamietti not only knew the McEwen family, but also knew the Cor family. Concerning the Cor family he testified:

"Q. You have known him for some time? A. Paul Cor?

"Q. Yes. A. Well, for just maybe a year or so is about all.

"Q. Were you friendly with Paul Cor? A. Yes.

"Q. Do you like him? A. Paul is a good boy; yes, I like him.

"Q. And you regard his evidence the same as anyone else's, you wouldn't hold it against him because he is charged here, would you? A. No, no.

"Q. You are not related to any of the McEwens, Mr. Tamietti? A. No, sir.

"Q. And do you know Paul Cor's mother and father? A. Yes, sir.

"MR. SHONE: Pass the juror."

■ Juror Tamietti owned a service station in Butte, Montana, and as brought out by his voir dire examination, many of the witnesses were patrons. He honestly said that the Cor case was the subject of much discussion in the City of Butte over a period of time but to say he "consulted with State witnesses" is incorrect. The case was coffee talk, as was the weather, and Mr. Shone's careful examination after the court's question revealed to him a man he felt he could impartially trust with his client's life for after the one challenge he did not renew the challenge but "passed the juror." No adverse ruling to his objection having been made he cannot now contend that the court committed error. Hayward v. Richardson Construction, 136 Mont. 241, 347 P.2d 475, 77 A.L.R.2d 1144.

■ Concerning the court's refusal to give defendant's instruction "O," previously quoted, on character evidence we find no error.

Three witnesses for the defendant testified as to his reputation as a truthful, peaceful and law-abiding citizen, and from this testimony defendant contends he was prejudiced by not allowing instruction "O."

■ Had the defendant accepted and followed the Montana

rule on an instruction on good character as set forth in State v. Jackson, 88 Mont. 420, 435, 293 P. 309, his specification of error would have merit, for clearly proposed Instruction "O" contemplates character evidence as independent proof of evidence, not the consideration our rule requires that it be considered in relation to all other evidence. Too, the defense should have submitted other instructions, or requested an instruction from the court, rather than to rely on the one instruction.

The law of Montana regarding character is set forth beginning with State v. Sloan, 22 Mont. 293, 56 P. 364; State v. Jones, 48 Mont. 505, 139 P. 441; and State v. Popa, 56 Mont. 587, 185 P. 1114. This court has held that evidence of general reputation is to be confined to the particular trait of character impugned in the alleged commission of the crime under investigation, and evidence of general reputation for honesty and integrity of one charged with homicide is altogether irrelevant.

To the defendant's specification of error IV we hold that no error was made by the trial court in not giving the requested instruction "P," previously quoted, that absence of motive is a circumstance in favor of his innocence.

In support of such argument, defendant cites State v. Hollowell, 79 Mont. 343, 256 P. 380, as authority for the statement that "Upon a trial for murder, the motive, or want of a motive, upon the part of the defendant for the commission of the crime is always a material question to be considered by the jury." What is not said is that this is a quotation from a case from Oklahoma, Miller v. State, 9 Okla.Cr. 255, 131 P. 717, L.R.A.-1915A, 1088, which may be the law in Oklahoma but most certainly is not the law of Montana.

A similar instruction was asked for and denied in State v. London, 131 Mont. 410, 434, 310 P.2d 571, and the denial of the instruction was approved by this court on the basis that it was a comment upon the weight of the evidence and an unwarranted invasion of the province of the jury. See also State v. Lu Sing, 34 Mont. 31, 85 P. 521; 53 Am.Jur., Trial, § 552.

 Specification V has previously been discussed and disposed of at the beginning of this case. The rule is that in reviewing the evidence, all conflicts are resolved in favor of the judgment. Whether the judgment will stand is to be determined only by whether any substantial evidence is found or whether inferences can be fairly drawn that will support the jury's findings. As we previously have said the record convinces us that there is more than sufficient evidence to support the verdict of the jury. State v. Toner, 127 Mont. 283, 263 P.2d 971; State v. Moran, 142 Mont. 423, 384 P.2d 777; State v. Akers, 106 Mont. 43, 74 P.2d 1138; Schneider v. United States, 10 Cir., 192 F.2d 498, certiorari denied 343 U.S. 914, 72 S.Ct. 646, 96 L.Ed. 1329; rehearing denied 343 U.S. 954, 72 S.Ct. 1045, 96 L.Ed. 1355.

Specification VI concerns alleged prejudicial error committed by the State in the presence of the jury referring to lie detector tests taken by the defendant. The particular reference occurred midway in the trial during the examination of Richard Walsh, a State's witness. Walsh, the Sheriff of Flathead County, is a graduate of the F.B.I. National Academy and a graduate of the Keeler Polygraph Institute. His appearance as a witness for the State was not only as a polygraph expert, but also as an experienced law enforcement official and investigator. He was asked whether he had examined a Ronald Carlson, one of the defendant's alibi witnesses and he said he had at which time an objection was made to the results of the examination which was sustained. The State then made an offer of proof out of the presence of the jury. The court then sustained an objection to the State's offer of proof. The State then made an offer of proof, outside the presence of the jury, that an examination of Paul Cor had been made to which defense made an objection and the same was sustained by the court.

The following colloquy took place after the two offers of proof had been refused.

"THE COURT: Very well, call the Jury back into Court and we will proceed then, gentlemen.

"MR. D. L. HOLLAND: Before we do that, your Honor, I want to instruct Mr. Walsh that I am going to ask certain questions relative to the examinations made by him of Paul Cor. I want him instructed that he is not to mention anything relative to a polygraph test of Paul Cor. I merely ask of him as to what was said at a certain time and not any results or not the surrounding circumstances of the test.

"MR. SHONE: Now, just a minute. The witness can testify that he made the tests.

"MR. D. L. HOLLAND: Well, that's—yes, I guess he can.

"MR. SHONE: But we are not going into the result of the tests?

"MR. D. L. HOLLAND: No.

"MR. SHONE: Now, we are going to ask what tests were made.

"MR. D. L. HOLLAND: We will have no objection.

"MR. ROBERT HOLLAND: Tell Mr. Walsh that he may.

"THE COURT: Mr. Walsh has been a witness so many times that I am sure he doesn't need any instruction about volunteering information, and you will allow counsel plenty of time to object if they wish. He has been here and listened to this, too.

"Call the Jury back."

(Whereupon the Jury returned to court with the bailiff and the trial of this matter proceeded as follows, to wit:

"THE COURT: Mr. Walsh, you are reminded that you are still under oath. You may continue with your direct examination for the State, Mr. Holland. Do counsel agree that the Jury is all present?

"MR. HOLLAND: State so agrees.

"MR. SHONE: The Jury is all present.

"THE COURT: Proceed."

(Direct examination continued by David L. Holland.)

346

"Q. Mr. Walsh, you are the same witness who was on the stand before the Jury left the room? A. I am.

"Q. Now, did you talk to Paul Cor at any time relative to this case? A. I did.

"Q. Would you tell me when that was and where that was? A. July 1st, 1960, at the Sheriff's Office here in Butte, Montana.

"Q. Who was present when you talked to him, Mr. Walsh? A. Just the subject and myself.

"Q. Now, did the subject make any statement relative to the repair of the bullet hole in the door of the car?

"MR. SHONE: We object to that as calling for a conclusion of the witness, and it is a matter which has already been ruled upon by the Court.

"THE COURT: Overruled.

"Q. (By Mr. D. L. Holland) Did he make any such statement? A. He did.

"Q. Tell the Jury exactly what he said? A. He stated that—

"MR. SHONE: Well, now, just a second. May we ask before this question is answered, your Honor? May we ask the witness a question?

"THE COURT: Yes. Proceed.

"MR. SHONE: Was this a question asked while he was taking the polygraph test?

"THE WITNESS: No, sir.

"MR. D. L. HOLLAND: Now, you can go ahead and answer? A. Well, he stated that he had accidentally shot the hole in the door of the car and that he had repaired it himself and painted over it because he didn't want his father to know about it, he was afraid his father would be mad about it."

Immediately thereafter on cross examination the following testimony occurred.

"MR. SHONE: And you took two polygraph tests—one on the 1st and one on the 4th? A. Actually there were four tests.

"Q. What? A. We consider a test as one chart.

"Q. Yes, but you said the first time and then you said on July 4th the second time? A. That's correct, the second examination.

"Q. And they were made with the consent of Paul Cor, weren't they? A. That is correct.

"Q. And by his attorneys? A. That is correct."

Later in the re-direct examination of Sheriff Walsh the following occurred:

"MR. DAVID L. HOLLAND: Now, then, Mr. Shone, I take it, from your previous objections you don't want the results of the polygraph entered. Will you make a stipulation that the results of the polygraph of Paul Cor be entered?

"MR. SHONE: Now, you were the one who asked that the Jury be excluded—

"MR. DAVID L. HOLLAND: You made—

"MR. SHONE: Now, wait a minute—while you made your statement....

"MR. DAVID L. HOLLAND: You made the reference to the polygraph relative to Paul Cor.

"MR. SHONE: Now, wait a minute. We object to the statement made to the Jury in the presence of the Jury by Deputy County Attorney David Holland. We assign it as a prejudicial error to the rights of this defendant.

"THE COURT: Sustained."

Prior to the testimony of Sheriff Richard Walsh the first mention of the word "polygraph" came into the case when Mr. Shone was conducting the re-cross examination of Mr. William Duckham, Deputy Sheriff of Silver Bow County, and one of the officials who worked on the case. It occurred in the following examination and testimony of Mr. Duckham.

"Q. Now, you say you have followed this case right up to date; I will ask you if within the last several days—well, we will say yesterday or day before—if you were still investigating

suspects in this case? A. No, but we have talked to different people.

"Q. And have you examined them—in the last two days? A. We've talked to some; I haven't examined any, no.

"Q. Were some put under a lie detector test? A. Yes. * * *

"Q. (By R. J. Holland) Mr. Duckham, would you explain then why these parties were given lie detector tests in the last few days? A. Well, concerning their whereabouts, their testimony and to see that they were cleared right down and to clear out their stories, exactly.

"Q. Do you know where the information came that brought them to the attention of the authorities here in Silver Bow County? A. From Mr. Shone."

In effect what the defendant asks this court to do is to rule that the very mention of the word "polygraph" or "lie detector" is per se reversible error, for in this case the court at all times refused to allow the results of the tests made to be introduced.

The problem of the use of the results of a polygraph test as competent evidence has been before this court only once before. In the case of State v. Hollywood, 138 Mont. 561, 358 P.2d 437, this court held that the results of a lie detector test were inadmissible. In that case the district court's decision denied the defendant's offer of proof of the results of a lie detector test. There, too, this court, at least by implication, held that the words "polygraph" or "lie detector" are not per se reversible error for the defendant devoted some forty pages of testimony to the use of the lie detector preparatory to his offer of proof.

As has previously been pointed out the first mention of "polygraph or lie detector" was by the defendant. With but one exception, People v. Kenny, 167 Misc. 51, 3 N.Y.S.2d 348 (1938), the courts of this country have ruled that the results of a lie detector test are inadmissible, and that decision must be considered in the light of what another later New York Court of

last resort held in the case of People v. Forte, 279 N.Y. 204, 206, 18 N.E.2d 31, 119 A.L.R. 1198. There the New York court said:

"An issue of law is raised by defendant which requires serious consideration. After all the evidence had been produced for the jury's consideration, defendant's counsel moved to reopen the case and be permitted to take defendant from Kings County to a laboratory in Bronx County to be examined under the pathometer, commonly known as the 'lie detector.' His motion was denied. We cannot take judicial notice that this instrument is or is not effective for the purpose of determining the truth. Can it be depended upon to operate with complete success on persons of varying emotional stability? The record is devoid of evidence tending to show a general scientific recognition that the pathometer possesses efficacy. Evidence relating to handwriting, finger printing and ballistics is recognized by experts as possessing such value that reasonable certainty can follow from tests. Until such a fact, if it be a fact, is demonstrated by qualified experts in respect to the 'lie detector,' we cannot hold as a matter of law that error was committed in refusing to allow defendant to experiment with it."

While the techniques of the operation of the polygraph have improved since this 1938 case and the polygraph has become a ready tool used by investigators, few states have allowed the results to be used in a criminal action. In Arizona the case of State v. Valdez, 91 Ariz. 274, 371 P.2d 894, allowed admission but only by stipulation of both parties, under a qualification set by the court. This case gives an excellent review of cases, texts, and law review articles, through 1962 concerning the use of the polygraph in civil and criminal cases.

Both the prosecution and defense counsel should beware of introducing legally questionable evidence during the course of a trial and the trial court should control such trial tactics. The facts indicate that defendant's very competent trial

counsel approved of the taking of the tests during the investigative state of the case; that the defendant voluntarily took the tests; that the results were not admitted by the trial court for the jury's consideration. In consideration of these facts and in view of the fact that no motion was made to admonish the jury to disregard the deputy county attorney's remarks, or any motion was made for a mistrial, we find no prejudicial error by the trial court.

Specification VII concerns itself with Deputy Sheriff Duckham's opinion testimony elicited by the defense in cross examination.

Mr. Duckham was one of the law enforcement officers who did much of the investigation and interviewing of persons connected with the case. He testified at length at the trial. The following testimony elicited by the defense, in cross and recross examination and by the prosecution in re-direct, is the portion alleged to be prejudicial by the defendant.

"MR. SHONE: Mr. Duckham, during your investigation of the case have you definitely found—now, I say 'definitely' found or discovered the person who murdered Sheri McEwen? A. I think so.

"Q. You think so? A. Yes.

"Q. Now is it absolutely positive in your mind? A. Yes.

"MR. SHONE: I see; that is all. * * *

"MR. R. J. HOLLAND: Mr. Duckham, who do you believe, from the evidence you have uncovered, is the murderer of Sheri McEwen? A. Paul Cor.

"MR. HOLLAND: That's all. * * *

"MR. SHONE: Now, just a minute, if you were in the jury box, would you convict Paul Cor? A. Yes.

"Q. On the investigation you have made? A. Yes, I would.

"Q. And hang him? A. Yes, I would.

"Q. You, would? A. Yes."

Here, trial counsel, a man of long trial experience, made a considered choice based undoubtedly on his experience,

and he opened "Pandora's Box." Such trial strategy or trial tactics cannot later be relied upon to reverse a jury decision. No objection was made to any of the testimony nor was the court requested to admonish the jury to disregard the testimony. Hence the defense opened the door and as said in 3 Am.Jur., Appeal and Error, § 879:

"An appellant cannot complain of error in the admission of evidence which he himself offered or drew out. This is true even of a defendant in a criminal case. One party cannot complain because the other party is permitted to prove a fact or a statement to which his own witnesses have already testified, nor can a party who introduces incompetent evidence complain if the trial court permits the other party to rebut the same. Moreover, a defendant who by inquiry, brings out part of a statement of a witness is not in a position to complain of the action of the opposing party in calling for and bringing out the complete statement. * * *"

The last specification of error concerns the failure of trial court to grant a motion for new trial on alleged newly discovered evidence.

Section 94-7605, R.C.M.1947, provides:

"A motion for a new trial, if made for any of the causes mentioned in the first, second, third, fourth or seventh subdivision of section 94-7603, must be made upon affidavits which must be filed at the same time as the notice of motion or within such further time, not exceeding thirty days thereafter, as may be allowed by the court or judge; in all other cases the motion must be made upon the minutes of the court. The official stenographic report of trials may be referred to as a part of the minutes of the court. The notice of motion must designate the grounds upon which the motion will be made. A motion for new trial must be heard upon the second day after notice is filed, or as soon as practicable thereafter, and in all cases the court or judge may, in his discretion,

make an order staying further proceedings in the case until such motion is disposed of.''

Here the motion for new trial and the notice of motion for a new trial were timely served on December 28, 1961, some eight days after the jury's verdict. The affidavits upon which the defendant bases his claim of ''newly discovered evidence that would probably result in an acquittal of Paul Cor,'' were filed as follows:

Carla Jo Davis, Oliva Rule and Gertrude Perry on May 7, 1962, some five months after the motion. The affidavits of A. G. Shone, Sylvester J. Sullivan and Paul D. Cor were filed on May 11, 1962.

While the defendant was granted thirty days to prepare and serve these affidavits on December 28, 1961, the court, in spite of the statutory requirements of section 94-7605, R.C.M.1947, still allowed the affidavits to be filed and the motion for a new trial to be heard on May 11, 1962.

A counter affidavit by the county attorney filed May 17, 1962, shows that his office investigated each of the people named in the affidavits and that each of the parties denied that they had any evidence or information relative to the case nor had they seen Sheri McEwen after June 10, 1960. In addition, counter affidavits were filed by Deputy Sheriff William L. Duckham, James Kello and Chief of Police James Clark, for the court's consideration. What more the trial court could have done to assist the defense is hard for this court to understand.

This court sits only as a reviewing tribunal, not as a court of original jurisdiction or one clothed with authority to try the motion *de novo*. State v. Broell, 87 Mont. 284, 286 P. 1108.

For the reasons stated the judgment is affirmed.

CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES CASTLES and ADAIR, concur.

MR. JUSTICE DOYLE, dissenting:

I dissent.

I believe that under any rule of law that Instruction "O" relating to the testimony of three witnesses as to the law abiding reputation of the defendant, despite the majority opinion should have been given the jury. The defendant was entitled as a matter of legal right to this instruction or some modification of it, which was not done.